UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JOBBIE FLOWERS,<br><br>Plaintiff,<br><br>v.<br><br>ELECTROLUX NORTH AMERICA, INC.,<br><br>Defendant. | Civil Action No. 3:20-CV-517-RJC-DCK |

**<u>Memorandum in Support of Motion for Summary Judgment</u>**

Plaintiff Flowers claims that Defendant Electrolux discriminated and retaliated against him on the basis of race and disability when it terminated his employment in January 2020. But the evidence shows that his poor work performance is to blame. Flowers regularly missed deadlines, disregarded instructions to work on tasks in the specified order, and failed to respond to his manager's inquiries into what he was working on. After coaching attempts proved fruitless, Electrolux placed Flowers on a performance improvement plan ("PIP") to give him the opportunity to correct these deficiencies. When he did not do so, Electrolux fired him.

Flowers has no direct evidence to support his claims, and they fail under *McDonnell Douglas*. Flowers cannot establish a prima facie case of discrimination or retaliation because he did not engage in any protected activity or put Electrolux on notice of his disability until after he was put on a PIP. Moreover, Electrolux treated him the same as a relevant comparator—a white, non-disabled coworker—as both performed poorly, were placed on PIPs, and were eventually fired when their work performance failed to improve. Flowers cannot establish pretext because poor work performance is the real reason he was fired. For these reasons, explained more fully below, the Court should grant Electrolux's motion and enter judgment in its favor.

**Statement of Facts**

**I.    Electrolux hires Jobbie Flowers to work in its IT department.**

Electrolux is a global leader in the manufacturing of appliances. The company maintains an Equal Employment Opportunity Policy. The Employee Handbook, which Flowers received, explains this policy and others to employees. (**Ex. 1** at 6, 7, 14–15.)

Electrolux hired Flowers in May 2011 to work in its information technology ("IT") department as an Application Support Analyst. (**Flowers Dep.** 14:5.) In this role, he provided tech support to users—typically other Electrolux employees—when they encountered problems with the technology they used to do their jobs. (*See id.* 24:10.) A user would call IT's "help desk" and "tell them what the problem is. At that point, a ticket was . . . created" describing the problem and IT's efforts to address it. (*Id.* 25:9.) If the help desk (level 1) could not fix the user's problem, they would send the ticket to level 2 of IT's Application Support team, where Flowers worked. (*Id.* 25:13.) "If [Flowers] couldn't resolve the issue, [he] would reassign it to a level 3 support person, and then they would resolve the issue." (*Id.* 26:1.) While Flowers had "duties or assignments other than working on the tickets [he] received from the help desk," this was Flowers' "primary role for th[e] position as an application support analyst." (*Id.* 26:20, 24:20.)

Flowers is African American. (*Id.* 146:12.) He also has Type 2 diabetes mellitus and was first diagnosed "around 2015," about four years after starting with Electrolux.[1] (*Id.* 138:1.) During his employment, Flowers would sometimes call in sick by emailing his manager to provide notice that he would be taking a sick day or working from home. A couple times, Flowers specified that he was in the hospital. (*See* **Sinclair Dep.** 65:16.) But he never stated that he had diabetes, and none of the three Electrolux employees who participated in the decision to terminate Flowers'

---

[1] In 2011, Flowers filled out electronic paperwork stating he did not have a disability. (**Ex. 2**.)

2

employment knew he had diabetes until after his employment ended. (**Simpson Dep.** 144:20; **Rawat Dep.** 110:17; Sinclair Dep. 66:7; *see also* **Moor Decl.** at 4.) Flowers was never absent from work for more than three days in a row.[2] (Sinclair Dep. 160:9.)

In 2015, Electrolux promoted Flowers to Application Support Team Lead. (Flowers Dep. 40:4.) He received a raise and additional responsibilities, but this was not a management position. (*Id.* 48:12; Rawat Decl. at 1.) IT support and the ticketing described above remained the "number one priority" for Flowers' position. (Flowers Dep. 78:19) During calendar years 2017 and 2018, Flowers reported directly to Brenda Simpson, the Director of IT Operations. (Simpson Dep. 13:10, 22:17; *see* Flowers Dep. 40:20, 78:13.) Simpson is Caucasian.

While Simpson was his direct manager, she "frequently observed problems with Flowers' work performance." (**Simpson Decl.** at 1.) Specifically, Flowers did not keep Simpson "informed of what he was working on." (*Id.*) "He often worked on tasks in a different order than [she] had instructed and failed to complete tasks within the assigned deadline. This would result in work projects not being completed on time." (*Id.*) At team meetings, when Simpson would probe Flowers for information about his work, he would express "[f]rustration with being questioned." (Simpson Dep. 22:20.) At these meetings, Flowers would speak in a "raised tone" and provide "[n]egative, not positive feedback" to others. (*Id.*) Other members of the team complained to Simpson about Flowers' behavior on multiple occasions. (*Id.* 24:13, 36:21, 49:20.)

Simpson "frequently" had "coaching and one-on-one sessions" with Flowers. (*Id.* 50:15.) [T]he behavior would stop for a period of time, and then it would return and [they] would have

---

[2] Electrolux's HR department would need to be notified if an employee were out sick for longer than three days, and the employee would need to file a claim with short-term disability insurance provider UNUM. (Rawat Dep. 180:8.) But this never happened in Flowers' case. Nor did Flowers ever take FMLA leave while employed by Electrolux. (Flowers Dep. 33:16.)

the conversation again." (*Id.* 25:6.) Thus, Flowers' work "performance was inconsistent." (*Id.* 182:23). In his performance evaluations for 2017 and 2018, Simpson gave Flowers a "meets expectations" rating. (**Ex. 3** at 3–5, 8, 26.) Given the up-and-down nature of Flowers' performance, it "leveled out" to this middle option out of five. (Simpson Dep. 182:24–183:3.) Flowers testified that he had a "[g]reat relationship with Brenda Simpson" and "didn't have a bad relationship with [her] at all." (Flowers Dep. 55:8.)

## II.    Kopal Rawat becomes Flowers' manager.

In January 2019, Simpson hired Kopal Rawat to manage the team Flowers worked on. (Simpson Dep. 13:22, 110:4.) She reported to Simpson. (Flowers Dep. 54:21; Rawat Dep. 24:3.) Rawat is Indian. (Rawat Dep. 13:10.) Rawat and Flowers interacted frequently; meetings of Rawat's team occurred daily, and Rawat and Flowers, as manager and team lead, met one-on-one once or twice a month. (*Id.* 48:18.) In Flowers' opinion: "[Rawat] didn't like me for one reason or another, so she was always talking down to me. She was just very mean to me. She treated me differently than anyone else on the team." (Flowers Dep. 55:21.) According to Rawat, "Flowers' behavior from those discussions became unprofessional. He was angry, loud, rolled his eyes sometimes, [and made] sarcastic comments." (Rawat Dep. 47:13.) He also interrupted Rawat and other team members when they were talking. (*Id.* 64:20, 101:11.) In early 2019, Flowers "walked out" of a team meeting "because he believed [Rawat] was singling him out." (*Id.* 60:18, 118:13.)

Like Simpson, Rawat observed issues with Flowers' work performance. He often failed to keep Rawat "updated with what he[ ] [was] working on," making it difficult for her to "gauge his effort or where he was spending his time." (*Id.* 84:1.) Frequently, Flowers did not meet deadlines or did things differently from his instructions. (*Id.* 84:4.) Flowers set his own priorities, working on tasks in a different order than "what was coming from the upper management or

[Rawat]." (*Id.* 84:9.) When Rawat would question Flowers on his workload, priorities, and the like, Flowers would exhibit the aggressive behaviors described above. (*See id.* 56:25.)

These deficiencies were particularly on display regarding a large project the team referred to as the "SharePoint migration." (Simpson Dep. 63:20; *see* **Rawat Decl.** at 2.) On this project, Flowers was "[n]ot sharing updates, not coming to the team meetings and . . . the tasks that he was working on took a really long time, and without any updates, [Rawat] didn't have any idea what was going on." (Rawat Dep. 191:2.) This resulted in delays that affected the whole project. (*Id.* 193:1.) Rawat constantly reached out Flowers to pinpoint any issues he has having and "[s]ee if he needed any help completing [tasks] or if . . . he's having any other conflicts or anything else, [to] help prioritize the work." (*Id.* 193:20.) But Rawat "struggle[d] to keep Flowers focused on this project and motivate him to complete his assigned tasks on time." (Rawat Decl. at 2.)

### III.    HR becomes involved.

In July 2019, Flowers "requested . . . for [Rawat] to introduce him to" Electrolux's human resources ("HR") department. (Rawat Dep. 43:1.) Rawat sent an email to Alexa Moor, the HR Business Partner for IT, and copied Flowers to introduce them. (**Moor Decl. Ex. 1** at 3.) Moor is Caucasian. (Rawat Dep. 125:8.) Moor met with Rawat and Flowers individually in the days that followed. (Moor Decl. at 2.) Rawat told Moor about Flowers' performance problems. (*Id.*) Moor recalled that "Brenda Simpson had previously told [her] that she observed similar problems with Flowers' work performance before Ms. Rawat was hired." (*Id.*)

After speaking with Rawat, Moor emailed her a template of a performance improvement plan. (*Id.* at 3; *see* **Moor Decl. Ex. 2**.) At Electrolux, managers issue a PIP "in instances where an employee fail[s] to meet the expectations of his or her position." (Moor Decl. at 2–3; *see* Simpson Dep. 56:19.) Following her usual practice, Moor created a PIP template by taking a PIP previously

issued to another employee, removing that employee's personal identifying information, and leaving enough content to give Rawat an example of how to use the form. (Moor Decl. at 3.)

Moor met with Flowers individually on July 26, 2019, to hear his concerns. (*Id.*) She then met with him and Rawat together in early August to "work through their communication issues." (*Id.* at 4.) Flowers did not mention discrimination of any kind in these interactions. (Moor Decl. at 4; *see* Flowers Dep. 61–62.) Flowers and Rawat agreed to have one-on-ones more often after this meeting. (Flowers Dep. 63:5; Rawat Dep. 151:19.) Flowers was not issued a PIP at this time.

Flowers and Rawat's working relationship did not improve. On September 16, 2019, Flowers emailed Rawat about their one-on-one meeting earlier that day, accusing her of treating their extra one-on-ones "like it was burdensome" and stating he wished to "discontinue [their] weekly One-On-Ones going forward." (**Moor Decl. Ex. 3** at 4.) Rawat responded by stating "[y]ou are trying to misquote what was discussed in our meeting" and pasted "the minutes of [the] meeting" that she took. (*Id.* at 3.) They included a summary of the topics discussed, Flowers' reactions, and Rawat's coaching efforts. Flowers forwarded Rawat's email to Simpson, stating that "I think this level of communication requires a mediator." (*Id.* at 2.) Simpson in turn forwarded the email chain to HR. (*Id.*) A few days later, Flowers sent a calendar invite to Rawat for a one-on-one scheduled for September 23, 2019, with the following message:

> I think we will require a mediator in all of our one-on-one's going forward. I think this will prevent any miscommunication that can sometimes lead to confusion on both ends. An Electrolux mediator or external party may the best option but I would like to consult with HR to see what options are available. I was the Chairperson for the Diversity and Inclusion Network at Hewitt for two years. Also, as you know, I am a community activist in both Mecklenburg and Forsyth County so I have some experience handling these types of situations.

(**Ex. 5**.) Simpson met with Flowers, where he discussed his frustrations and communication issues with Rawat, and she explained the company was not "staffed . . . for mediators to attend every

one-on-one with a manager and an employee" and that they "have to be able to work manager to employee, employee to manager" as professionals. (Simpson Dep. 15:15–16:14.) After that, he said "he could progress forward and they would work better together and he would communicate, and so the request for mediator ended at that point. It did not come back up." (*Id.* 119:1.)

Around this time, Alexa Moor left Electrolux to take another job and Naomi Sinclair assumed her role as HR business partner for IT. (Moor Decl. at 4; Sinclair Dep. 69:14.) Sinclair is African American. (Sinclair Dep. 5:25.)

## IV. Electrolux places Flowers on a PIP.

Flowers' work performance did not improve. In October 2019, Roy Harris, the project manager for the SharePoint migration, told Rawat about Flowers' recent lack of diligence there:

> [Jobbie] has not been to the past two meetings and when I reached out to him, he stated that he was under the impression that his part of the work was completed (the IT SharePoint sites). A few of those (IT sites) still need to be put into the correct state, but I assumed that once those were completed, then he would go back to the backlog and get more sites that need to be migrated.

(**Rawat Decl. Ex. 1**.) Rawat then conferred with Simpson and Sinclair regarding Flowers' performance issues. To get up to speed, Sinclair spoke to Rawat and Simpson. (Sinclair Dep. 52:5.) Simpson told Sinclair these were not new issues. (*Id.*; *see* Simpson Decl. at 2.) Rawat made the decision to place Flowers on a PIP and drafted a PIP document that Simpson and Sinclair then reviewed and signed off on. (*See* **Ex. 7** at 1–4.) The format was different from the template Moor had previously sent Rawat. (*Compare* Ex. 7 *with* Moor Decl. Ex. 2.) The three presented and explained the PIP to Flowers at a meeting on November 8, 2019. (*See* Rawat Dep. 216:3.) The document was signed by all four. (Ex. 7 at 4.)

The PIP instructed Flowers to "timely convey . . . information to his manager and relevant teams by providing clear justification for decisions" made while working on tasks. (*Id.* at 2.) It

contained specific deadlines for some tasks. Expectations here included "[i]nvolv[ing] his manager in the discussion regarding escalation and prioritization" of tasks and "[d]iscuss[ing] action items with manager to seek approvals prior to execution of new tasks." (*Id.*) It instructed Flowers to "[r]espond to/address management questions/concerns in timely manner" and "[p]rovide weekly status reports to manager every week Friday" in a specified format. (*Id.* at 3.) Instead of working to improve his performance, Flowers hired an attorney to send a demand letter to Electrolux communicating—for the first time—Flowers' belief that Rawat's questioning of his work performance constituted race and disability discrimination. (**Ex. 6**.)

The four met again on December 9, 2019, for a one-month review. (Simpson Dep. 152:3.) The one-month review document stated that Flowers "has not achieved the required improvement as outlined." (Ex. 7 at 5.) Flowers failed to complete Change Advisory Board ("CAB") tasks assigned to him by the deadlines he agreed to meet. (*Id.*) He missed deadlines on tasks related to the SharePoint migration, as well. (Simpson Dep. 160:5.) He failed to assign to himself and complete service tickets for IT service requests every day as expected. Specifically, Flowers also only assigned himself a *single* ticket between the months of November and December 2019. (Ex. 7 at 5.) Flowers also failed to "[r]espond to/address management questions/concerns in timely manner," including emails from both Rawat and Simpson, and failed to "[p]rovide weekly status reports to [his] manager" after receiving instructions to do so numerous times. (*Id.* at 6.) These issues were discussed with Flowers during the one-month review meeting. (Simpson Dep. 159:4.)

Flowers' two-month review was scheduled for January 9, 2020. (*see* Rawat Dep. 212:12.) But the holidays intervened; Rawat was out of the country and Flowers missed a few days of work due to vacation and illness. (Sinclair Dep. 130:2, 150:17.) So Rawat extended the evaluation period by two weeks to allow for more time to evaluate Flowers' performance before meeting again. (**Ex.**

**4**; Simpson Dep. 164:4.)

Flowers and Rawat continued to have regular one-on-ones during the PIP. Naomi Sinclair sat in on one of these meetings on Friday, January 10, 2020. (Ex. 7 at 9; Sinclair Dep. 131:22.) At that meeting, Rawat asked Flowers what he worked on that week. (Ex. 7 at 9.) "[H]e was not able to tell [her] how much time it took him to" complete a task and stated that he had been "catching up on emails for three or four days." (Rawat Dep. 228:18; Ex. 7 at 9.) Sinclair recalled:

> [Flowers] was asked about what he had been working on, what projects, what he had been completing throughout that week, and his response stood out to me be-cause, you know, he kind of had a smirk, and he stated that he had been checking some emails, and that he completed one assignment. And I wasn't really familiar with the length of time that it took to complete whatever that assignment was, so I remember asking, you know, Okay. Well, how long does it usually take to complete this assignment that he's stating he's worked on for the past three or four days? And the time period that Kopal responded with, it was not even a half a day worth of work. And so, you know, again, that stood out to me, that situation because I said, Okay. We have an employee that is on a performance improvement plan and is not able to at least try to muster up some, you know, reason as to why he hasn't been working for a few days while he's at work but not performing, it's quite unusual.

(Sinclair Dep. 158:18–159:13.) Rawat testified: "that's when I felt like this is going nowhere. There's no improvement." (Rawat Dep. 228:22.)

Rawat and Sinclair "had a discussion following that meeting . . . the next step being termi-nation." (Sinclair Dep. 161:10.) They both recommended termination to Simpson. (Simpson Dep. 171:14.) After a discussion, the three collectively agreed that it was the appropriate course of ac-tion. (*See id.* 170–71.) They decided to terminate Flowers' employment at the (rescheduled) sec-ond-month PIP meeting the following week on January 22, 2020. (*Id.* 172:24.) This cut short the ninety-day PIP by about two weeks. The original PIP document made clear that "[t]he 90-day period of this plan should not be construed as a guarantee of employment for this period. Should your performance show further deterioration . . . your employment might be terminated prior to the end of the 90-day performance improvement plan." (Ex. 7 at 4.) Sinclair explained that cutting

the PIP short here was warranted because there "wasn't any progress being made" in Flowers' performance. (Sinclair Dep. 163:7.) And this procedure is not unusual. (Moor Decl. at 3.)

Flowers' employment was terminated at the January 22 meeting, which Rawat, Simpson, and Sinclair also attended. The two-month review PIP document explained the continued deficiencies in Flowers' performance. For example, Flowers had assigned himself "10 tickets . . . since 12/05/2019." (Ex. 7 at 8.) "The other team members worked on 26, 34, [and] 34 tickets each during this same time period." (*Id.*) He continued to refuse "to adhere to priorities assigned by manager [which had] been addressed multiple times prior to and throughout the duration of the performance improvement plan." (*Id.*) And he failed to respond to a request for information from Rawat. (*Id.* at 10.) Flowers's position was not replaced. (Simpson Dep. 124:11.)

### Legal Standard

At summary judgment, the movant must demonstrate that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" only if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "When the moving party has carried its burden under Rule 56(c), . . . the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the Court views the facts in the light most favorable to the nonmovant, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.,* 57 F.3d 1317, 1323 (4th Cir. 1995). "A plaintiff's own self-serving opinions, absent anything more" are insufficient to overcome summary judgment, *Mackey v. Shalala*, 360 F.3d

463, 469–70 (4th Cir. 2004), as are "[t]he plaintiff's own perceptions of his performance and unsupported allegations," *El v. Tek Sys., Inc.*, 311 F. Supp. 2d 516, 521 (E.D. Va. 2002). In other words, "[m]ere speculation by the non-movant cannot create a genuine issue of material fact." *JKC Holding Co., LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

**Argument**

Flowers has no direct evidence of discrimination. He must therefore proceed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under the *McDonnell Douglas* framework, to survive a summary judgment motion the plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." *Rowe v. N.C. Agr. & Technical State Univ.*, 630 F. Supp. 2d 601, 607 (M.D.N.C. 2009). As explained below, Flowers cannot do so.

## I.    Flowers' Retaliation Claim Under Title VII

Flowers claims that Electrolux retaliated against him for making complaints of race discrimination, in violation of Title VII, when it placed him on a PIP and later terminated his employment. (D.E. 1 at 6–7.) Flowers' claim fails at steps one and three of *McDonnell Douglas*.

### A.    Flowers fails to establish a prima facie case of retaliation.

At step one, "the employee must . . . establish a prima facie case of retaliation." *Rome v. Dev. Alts., Inc.*, 587 F. App'x 38, 40 (4th Cir. 2014). This requires showing that (1) he engaged in a protected activity; (2) the Company took an adverse employment action against him; and (3) a sufficient causal connection existed between his protected activity and the adverse employment action. *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996). Electrolux admits that it took an adverse action against Flowers by terminating his employment after placing him on PIP.

### 1. Flowers did not engage in protected activity until after he had been placed on a PIP.

To constitute "protected activity," a complaint must "put the employer on notice that [it] was based on racial . . . discrimination." *Shung-Lung Chao v. IBM Corp.*, No. 5:09-CV-77-BO, 2010 WL 2465234, at *4 (E.D.N.C. June 15, 2010). Mere "complaints of 'unfair treatment'" do not suffice. *Id.* After he had been placed on a PIP, Flowers hired an attorney to send a demand letter to Electrolux claiming that it was discriminating against him because of race and disability. This constitutes protected activity. But this was the first time Flowers engaged in it.

While Flowers made complaints about Rawat to several Electrolux employees, he never claimed that he was being discriminated against on the basis of race until after he was placed on a PIP. Rawat testified that during all of their (sometimes heated) discussions, Flowers "never, ever mentioned his race or him being African-American or him being black." (Rawat Dep. 165:12.) Simpson testified that "in all of these meetings that [she] had with Mr. Flowers," he "never said anything to [her] that [Rawat] was treating him differently because he's black." (Simpson Dep. 40:15.) And Sinclair testified that "there was no mention of his race" before Electrolux received the attorney demand letter. (Sinclair Dep. 108:5.) Flowers now claims he complained of race discrimination before that, but "[a] plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination." *Mackey*, 360 F.3d at 469–70 (emphasis omitted).

Flowers claims that his September 20, 2019 email to Rawat requesting a mediator in their one-on-ones constitutes protected activity. Therein, Flowers wrote "I was the Chairperson for the Diversity and Inclusion Network at Hewitt for two years. Also, as you know, I am a community activist in both Mecklenburg and Forsyth County so I have some experience handling these types of situations." (Ex. 5.) But this email did not put Electrolux on notice that Flowers was complaining

of discrimination. It does not accuse Rawat or anyone else of violating any law. It does not mention discrimination of any kind. And it does not mention race. The term "community activist" does not connote race—indeed, Flowers testified his community activism was on behalf of the homeless and at-risk teenagers. (Flowers Dep. 75:10.) And the term "Diversity and Inclusion" only alludes to race, as it encompasses a much broader swath of characteristics. When asked what "'diversity inclusion' means to [her]," Simpson testified: "ensuring . . . that we broaden our resource pool and ensure that we include race, culture, religions, gender. It is making sure that we have a broad pool of resources and we treat them the same." (Simpson Dep. 102:25–103:14.) Rawat and Simpson both testified that they did not recognize this email as complaining about race discrimination when they received it.[3] (*Id.* 104:1; Rawat Dep. 165:12.)

Courts have found that even explicit mentions of race do not necessarily transform a statement into protected activity. For example, in *Verna v. Public Trust of Miami-Dade County*, the alleged protected activity was a letter the plaintiff had written that "complained that [a coworker] had yelled at her and ridiculed her work and that she had been subject to unfair treatment since her promotion." 539 F. Supp. 2d 1340, 1357 (S.D. Fla. 2008). The court held that the letter did not constitute protected activity, even though it mentioned race:

> While the letter requested "an investigation to find the real cause for such violation behaviors in this workplace," [it] does not reference any law or policy that the complained of behavior was violating. Finally, although the letter includes the question "is it my color?" in two different paragraphs, read as a whole, [it] is not sufficient, as matter of law, to "clearly put an employer on notice of a violation of the law."

*Id.* at 1358. (citation omitted). The email here has an even weaker connection to race and thus does not constitute protected activity. Like the letter in *Verna*, it does not complain about discrimination or a violation of any law. This provides an additional reason why it does not constitute protected

---

[3] Plaintiff's counsel did not ask Sinclair about this email during her deposition.

activity. *See, e.g.*, *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 262–63 (1st Cir. 1999) (no protected activity where plaintiff complained of supervisor's treatment but never stated a belief that it violated Title VII or any other law); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694 (3d Cir. 1995) (letter to HR complaining about unfair treatment but not specifically complaining about discrimination is not protected activity); *Brown v. Int'l Bus. Machines Corp.*, No. CIV.A. 95-7566, 1996 WL 411650, at *4 (E.D. Pa. July 16, 1996) ("[Plaintiff's] statement that he opposed IBM's 'illegal employment practices' is not sufficient to put IBM on notice [of] protected activity . . . .").

Finally, Flowers' own deposition testimony shows that he brought up diversity and inclusion because of his prior experience with meditators, not to hint at race discrimination:

> Maybe our next step is to be able to get a mediator. Now, when I was the chairperson for the diversity inclusion at Hewitt, this is something that we didn't frown upon. We wanted for mediators to be able to come in and mediate a situation before things got too far . . . .

(Flowers Dep. 73:9.) Of course, Flowers also claimed during his deposition that Electrolux discriminated against him on the basis of race, but these inconsistencies in his own testimony further weaken his case at summary judgment. *See Rodriguez v. Cty. of Nassau*, 830 F. App'x 335, 338–39 (2d Cir. 2020). Accordingly, Flowers' email does not constitute protected activity because it failed to put Electrolux "on notice" that he was complaining about discrimination.

### 2. Flowers cannot establish but-for causation.

Here, Flowers is limited to "traditional principles of but-for causation" and must prove that his employment "would not have been terminated but for h[is] employer's retaliatory animus." *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 249, 252 (4th Cir. 2015) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). He cannot do so.

As discussed above, Flowers' only protected activity was the demand letter his attorney

sent to Electrolux after he had already been placed on a PIP. "Causation moves forward, not backwards, and no protected conduct after an adverse employment action can serve as the predicate for a retaliation claim." *Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 42 (1st Cir. 2013). The Fourth Circuit has repeatedly held that while "Title VII serves the laudable goals of protecting employee access to agencies and courts," "[i]t does not shield employees from normal sanctions for misconduct." *Ross v. Commc'n Satellite Corp.*, 759 F.2d 355, 366 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *see also Bodoy v. N. Arundel Hosp.*, 945 F. Supp. 890, 898 (D. Md. 1996) (employees cannot insulate themselves from disciplinary action simply by filing a discrimination charge).

In *Szarzynski v. Roche Laboratories, Inc.*, for example, after being placed on a PIP, the plaintiff complained to HR about a coworker's ageist comment made months prior. No. 07-CV-6008, 2010 WL 811445, at *13 (W.D.N.Y. Mar. 1, 2010). Noting the plaintiff "kn[ew] of this remark for two months, [and] made no complaint about it until after he was placed on a PIP," the court concluded that the "PIP placement could not be retaliatory since plaintiff had not yet engaged in any protected activity as of the commencement of the PIP." *Id.* The logic of *Szarzynski* applies here. If Flowers truly thought that the months-long friction between himself and Rawat was race-based, he could have raised that complaint at any time, in one of his many communications with Rawat's superior, Simpson, and HR. But he did not. He waited until after being placed on a PIP, when he knew his job was in jeopardy, to make any such complaint. Neither Title VII nor a demand letter may "shield [Flowers] from normal sanctions for misconduct." *Ross*, 759 F.2d at 366.

## B.    Electrolux's legitimate, nonretaliatory reason for firing Flowers

At step two of *McDonnell Douglas*, the defendant must "produce a legitimate, nonretaliatory reason for" the adverse employment action. *Billingsley v. Fed. Home Loan Mortg. Corp.*, No.

1:18-CV-755, 2019 WL 5104748, at *5 (E.D. Va. Oct. 10, 2019). Here, it is Flowers' poor work performance. Flowers was placed on a PIP and ultimately fired because he repeatedly failed to complete tasks on time, work on projects in the order he had been instructed, and keep his managers informed as to what he was working on.

### C. Flowers cannot show pretext.

At step three of *McDonnell Douglas*, "the plaintiff resumes the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for discrimination." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016). To show that this was pretextual, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (cleaned up).

Flowers can satisfy neither of these elements. Electrolux has put forth ample evidence that poor work performance was the reason Flowers was placed on a PIP and ultimately fired. This includes testimony of four witnesses and multiple documents corroborating that testimony. "The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Minhngoc P. Tran v. Boeing Co.*, 190 F. App'x 929, 933–934 (11th Cir. 2006) (citation omitted). That Flowers was assigned specific tasks in the PIP and failed to complete them is beyond dispute. Flowers has no evidence that Electrolux would accept such failures had it not received the attorney demand letter.

Flowers will argue that the "temporal proximity" between the demand letter and termination show pretext. But this argument fails for three reasons. First, the Fourth Circuit "has previously noted that a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick*

*Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (citation omitted). The letter from Flowers' attorney is dated November 29, 2019, and Electrolux terminated Flowers' employment nearly two months later on January 22, 2020. Second, "any inference of causation that might arise out of the temporal proximity is more than rebutted by the facts that, prior to the protected activity, [Flowers] had been told that [his] performance was sub-par" and placed on a PIP. *Id.* Third, Flowers' "poor performance continued . . . after h[is] complaints about discrimination." *Id.*

Because Flowers has failed to establish a prima facie case and has no evidence of pretext, the Court should grant Electrolux summary judgment on his Title VII retaliation claim.

## II.     Flowers' Race Discrimination Claim Under Title VII

Flowers also asserts a disparate-treatment claim of race discrimination under Title VII. (D.E. 1 at 6.) It appears that Flowers proceeds under a theory premised upon the enforcement of employee disciplinary measures. (*See id.* at 5.)

### A.     Flowers fails to establish a prima facie case of race discrimination.

Here, Flowers must show: "(1) that [ ]he is a member of the class protected by Title VII, (2) that the prohibited conduct in which [ ]he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against h[im] were more severe than those enforced against those other employees." *Hurst v. District of Columbia*, 681 F. App'x 186, 190 (4th Cir. 2017). As to the first element, Electrolux admits that Flowers is African American and race is a protected class under Title VII.

"[T]o be a similarly situated comparator, the employee normally must share the same supervisor as [the] plaintiff." *Perry v. Mail Contractors of Am., Inc.*, No. 3:12-CV-405, 2013 WL 6119226, at *5 (W.D.N.C. Nov. 21, 2013). The only relevant comparator to Flowers here is Robert Kean. He was also a member of Rawat's team and the only other employee managed by Rawat

with documented instances of poor work performance. (*See* Rawat Dep. 25:4, 26:3.) He was also the only other employee managed by Rawat who was placed on a PIP or fired. (Simpson Dep. 83:13; Rawat Dep. 25:4; Sinclair Dep. 41:8.) Kean is Caucasian. (Rawat Dep. 25:8.) Kean's performance issues stemmed from "mak[ing] mistakes while deploying the code from one environment to another." (Rawat Dep. 26:8; *see id.* 26–27.) Kean had previously been placed on a PIP by Simpson before Rawat was hired, but successfully completed it and remained employed at Electrolux. (Simpson Dep. 78:21, 79:4.) Kean's second PIP began in May 2020. (**Ex. 8** at 1.)

### 1. Flowers' and Kean's misconduct was comparable in seriousness.

The Fourth Circuit has recognized that while comparators must be similarly situated, "the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Courts "therefore consider whether the comparator discipline evidence in the record, taken as a whole, is sufficient for [a plaintiff] to show that she was more severely disciplined than comparably situated employees outside her class who made [similar] errors." *Lauture v. St. Agnes Hosp.*, 429 F. App'x 300, 306, (4th Cir. 2011).

Flowers and Kean were both placed on PIPs and eventually fired due to poor work performance. The PIPs in both instances were drafted from the same template and included many of the same goals, expectations, and instructions. (*Compare* Ex. 7 *with* Ex. 8.) Both sets of PIP documents state that "[a]ssigned projects/tasks are to be completed on time following the defined process, priorities and agreed timeline" and include instances of Kean and Flowers missing deadlines. (Ex. 7 at 2, 5; Ex. 8 at 2, 9.) They also emphasize that the employee was expected to "[r]eport and communicate on assignments without a reminder or follow up communications from management" and "[r]espond to/address management questions/concerns in timely manner." (Ex. 7 at 3; 8 at 3.)

Their poor work performances are thus comparable.

### 2. The disciplinary measures taken against Kean and Flowers are identical in every material respect.

Flowers cannot show that Electrolux "disciplined him more severely than [a] white [coworker] who committed comparable offenses" because Flowers and Kean both received the same discipline. *Maull v. Div. of State Police*, 39 F. App'x 769, 773 (3d Cir. 2002). Both were placed on PIPs and eventually fired when their performance failed to improve to a satisfactory level. The only difference is timing. Flowers' ninety-day PIP was cut short by about two weeks, and Kean's sixty-day PIP was extended to ninety days total. To the extent this qualifies as disparate treatment at all, Electrolux's reason for doing so is nondiscriminatory and eminently reasonable.

Rawat testified that Flowers' ninety-day PIP was cut short "[b]ecause there were no improvements that were there in the initial two [thirty-day periods] that we worked on. It was more than 60 days, but no improvement was made." (Rawat Dep. 195:21; *see* Simpson Dep. 61:2.) The thirty- and sixty-day follow-up PIP documents both state that Flowers had "not achieved the required improvement as outlined." (Ex. 7 at 5, 8.) Flowers made this especially clear at the one-on-one meeting with Rawat and Sinclair on January 10, 2020, when he had no satisfactory answer for what he had been working on for four days. Flowers' PIP (and Kean's, for that matter) expressly state: "Should your performance show further deterioration . . . your employment might be terminated prior to the end of the 90-day performance improvement plan."[4] (Ex. 7 at 4; *see* Ex. 8 at 4.)

By contrast, Kean's PIP was extended to ninety days because he showed improvement. It was originally set at sixty days, as it was his second PIP. Kean's two-month review states that "did

---

[4] Nor was Flowers the only Electrolux employee to be fired before the end of a scheduled PIP. An employee named Ken Cuebas was fired before the end of his PIP because "[h]e was not meeting his objectives defined in the performance improvement plan." (Simpson Dep. 61:18.)

make some improvement during [the] second month of [his] PIP by wrapping up long overdue tasks like factory deployment to all locations, updating Application Portfolio and following up with business users." (Ex. 8 at 10.) His employment was terminated during that extended period because his performance backslid: "he made a mistake in one of the production environment[s] which was very detrimental." (Rawat Dep. 27:5.)

Ultimately, Flowers and Kean were both afforded at least sixty days to improve their performance after being placed on a PIP. Kean worked to improve his performance, successfully did so for a time, and received an extension to the PIP timeline recognizing that effort and result. He was fired because he failed to maintain that improvement. Flowers made no attempt to improve his performance at all, which indeed worsened. Thus, Flowers cannot show "that the disciplinary measures enforced against h[im] were more severe than those enforced against [Kean]." *Hurst*, 681 F. App'x at 190.

### B. Electrolux's legitimate, nondiscriminatory reason for firing Flowers

Electrolux's legitimate, nondiscriminatory reason for the adverse employment action here is the same as above: Flowers' poor work performance.

### C. Flowers cannot show pretext.

Here, Flowers must prove that this reason was pretextual by showing "both that the reason was false, and that discrimination was the real reason for the challenged conduct." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998) (cleaned up). Flowers has no evidence upon which a jury could find pretext. He cannot show that the myriad documented instances of his poor performance were somehow fabricated or false. He admitted during his deposition that the expectations listed in his PIP were "reasonable." (Flowers Dep. 97:13, 98:8, 98:15, 98:17, 98:20, 101:19, 102:22.) He did not meet them. On November 19, 2019, Flowers received an email from Simpson

asking him questions. (Ex. 7 at 6.) He never responded, even after Simpson sent him a reminder email. (*Id.*) Flowers assigned himself only "10 tickets" when "[t]he other team members worked on 26, 34, [and] 34 tickets each during this same time period." (*Id.* at 8.) Most egregiously, he spent the better part of a week doing absolutely nothing but "catching up on emails" and completing one assignment that would take less than "half a day." (Rawat Dep. 228:18; Sinclair Dep. 159:6.) Flowers has no evidence to contradict any of these facts. And he cannot seriously argue that this performance was satisfactory. Nor can Flowers show that a white employee who had similar problems with performance was treated more favorably than him. Flowers and Kean both engaged in similar misconduct, were placed on PIPs, and then fired.

Significantly, the decision to terminate Flowers' employment was made by three individuals. While Simpson was the ranking member among them, all three "collectively made the decision" and "[i]f one of the three of [them] had disagreed with the other two regarding that decision, Flowers' employment would not have been terminated at that time." (Simpson Decl. at 2.) Rawat is the only one Flowers has accused of "discriminat[ing] against [him] because" of his race. (Flowers Dep. 102:11.) Flowers admitted that he had a "[g]reat relationship with Brenda Simpson" and "didn't have a bad relationship with [her] at all." (*Id.* 55:8.) And Naomi Sinclair, like Flowers, is African American. "Evidence that the person who made the final decision to terminate a particular plaintiff was the same race as the plaintiff undercuts any inference of discrimination." *Eadie v. Anderson Cty. Disabilities & Special Needs Bd.*, No. CA 8:07-3406-HMH-WMC, 2009 WL 537637, at *10 (D.S.C. Mar. 4, 2009). Thus, Flowers cannot show that the well-documented reason for his firing, reached by a consensus of three individuals, is somehow false or pretextual.

### III.   Flowers' Claim for Disability Discrimination Under the ADA

Flowers also claims that Electrolux discriminated against him on the basis of disability

(diabetes), in violation of the Americans with Disabilities Act of 1990 ("ADA"). (D.E. 1 at 7–8.)

## A. Flowers fails to establish a prima facie case of disability discrimination.

At step one of *McDonnell Douglas* in this context, Flowers must show that (1) he "is within the ADA's protected class"; (2) he "suffered adverse employment action; (3) he was performing his job at a level that met his employer's "legitimate expectations" at the time of the adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination." *Williams v. Brunswick Cty. Bd. of Educ.*, 725 F. Supp. 2d 538, 543 (E.D.N.C. 2010). Electrolux admits that Flowers has diabetes and that diabetes is a disability covered by the ADA. Flowers' claim fails on the third and fourth elements.

### 1. Flowers' work performance did not meet Electrolux's legitimate expectations at the time he was fired.

As discussed above, poor work performance is the reason Flowers was placed on a PIP and eventually fired. Electrolux "reprimanded [Flowers] based on concrete, specific observations and accompanied its reprimands with explicit instructions on how to improve." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517–18 (4th Cir. 2006). Despite being "placed on a PIP and given [the] opportunity to meet h[is] employer's performance expectations," Flowers' "unprofessional behavior, poor performance, and h[is] employer's raised concerns each constitute failure to meet the legitimate expectations of h[is] employer." *Bellounis v. Middle-E. Broad. Network, Inc.*, No. 1:18-CV-00885, 2019 WL 5654307, at *4 (E.D. Va. Oct. 31, 2019).

"Whether an employee is performing at a level that meets legitimate expectations is based on the employer's perception, and [the plaintiff's] own, unsubstantiated assertions to the contrary are insufficient to stave off summary judgment." *Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010); *see Parker v. Magna Innertech-Spartanburg*, No. CIV.A. 6:09-773-JMC, 2010 WL 5488599, at *7 (D.S.C. Nov. 29, 2010) (report and recommendation) ("The plaintiff has only her

own subjective opinion to support her claim that she was performing her job at a level that met the defendant's legitimate expectations, while the defendant has documented specific examples of her poor performance[.]"), *adopted*, 2011 WL 13455 (D.S.C. Jan. 4, 2011). Faced with "abundant evidence" of his poor work performance—including several exhibits, the PIP documents, and the testimony of four witnesses—Flowers cannot "create a genuine dispute concerning his prima facie case by cherry-picking the record to find one isolated instance where he arguably performed better than the average employee." *Warch*, 435 F.3d at 518. Nor can he do so by pointing to his performance evaluations in previous years, as they are irrelevant here.[5] Thus, even when viewing the evidence in the light most favorable to Flowers, "no reasonable jury would find that he was meeting [Electrolux's] legitimate performance expectations." *Id.*

### 2. Flowers has no evidence that disability factored into Electrolux's decision to terminate his employment.

"To establish the fourth *prima facie* element of a wrongful discharge claim under the ADA, [Flowers] must present some 'affirmative evidence that disability was a determining factor in the employer's decision.'" *Feldman v. Law Enf't Assocs. Corp.*, 955 F. Supp. 2d 528, 539 (E.D.N.C. 2013) (citation omitted). Flowers "must show that the employer knew of his . . . disability at the time it took the adverse employment action." *Id.*; *see Huppenbauer v. May Dep't Stores Co.*, 99 F.3d 1130, 1996 WL 607087, at *7 (4th Cir. 1996) (table) (collecting cases).

The decisionmakers—Rawat, Simpson, and Sinclair—each testified that they did not know Flowers had diabetes until after his employment ended. (Simpson Dep. 144:20; Rawat Dep. 110:17; Sinclair Dep. 66:7; *see also* Moor Decl. at 4.) Assuming *arguendo* that the demand letter

---

[5] In any case, Flowers' performance evaluations in the two years he reported to Simpson (before Rawat's hiring) were not glowing. Simpson rated him "meets expectations," the middle option out of five. (*See* Ex. 3 at 7, 11, 24, 26.)

from Flowers' attorney put Electrolux on notice of his disability, it was sent weeks after Flowers was placed on a PIP for poor work performance. Neither the ADA nor a demand letter may "shield [Flowers] from normal sanctions for misconduct." *Ross*, 759 F.2d at 366.

Flowers was never reprimanded or punished for anything related to his disability. Flowers testified that the "two main symptoms" he experiences related to his diabetes are "[f]requent urination" and seeing "spots if [his] blood sugar is too high." (Flowers Dep. 138:6.) He elaborated that he sometimes he experiences "flare-ups" that can be "very debilitating for a period of time." (*Id.* 138:12.) When that happened to Flowers during his employment at Electrolux, he would call in sick by sending an email to his manager and other members of his team. (*See id.* 147:5.) As Naomi Sinclair testified, Flowers' attendance "was never a problem." (Sinclair Dep. 68:20.) Flowers never ran out of sick days, was never reprimanded for missing work,[6] and was never absent for more than three days in a row. (*Id.*; *see* Flowers Dep. 33:21.) He never took FMLA leave or short-term disability leave. (*Id.* 33:16.) Sinclair explained that there was "no need to look into this further or about his days being out of the office, because . . . it wasn't to the point where he needed to request an official leave of absence because he had only been out of the office three days, and he didn't express the need to be out longer." (Sinclair Dep. 154:7.)

**B.**      **Legitimate, nondiscriminatory reason for terminating Flowers' employment**

As above, Electrolux's "legitimate non-discriminatory reason for the adverse employment action" is poor work performance. *Williams*, 725 F. Supp. 2d at 543.

---

[6] At one point during his PIP, Flowers was reprimanded for failure to inform his acting manager of an absence, not the absence itself. (Ex. 7 at 10–11.) And at the time, Flowers claimed the absence was for "a personal matter," not an illness or his diabetes. (**Ex. 9** at 2.)

### C.    Flowers cannot show pretext.

As Electrolux's legitimate, non-discriminatory reason for terminating Flowers' employment is the same here as above, Electrolux incorporates its arguments above explaining that Flowers can show neither that the reason was false nor that discrimination was the real reason.[7]

## IV.    Retaliation Under the ADA

The complaint does not plead a claim of retaliation under the ADA, unlike Title VII. (*Compare* D.E. 1 at 6 (pleading "Discrimination and Retaliation on the Basis of Race"), *with id.* at 7 (pleading only "Disability Discrimination").) If Flowers argues that he has pleaded a claim of ADA retaliation, the Court should dismiss it. In any event, the above arguments explaining why Flowers' other claims fail apply with equal force to any retaliation claim based on disability.

## V.    Flowers' Claims Under State Law

The complaint pleads claims for wrongful discharge in violation of public policy under the North Carolina Equal Employment Practices Act. (D.E. 1 at 8.) Flowers' retaliation claim fails "because retaliation is not a basis for wrongful discharge under state law." *See Adjabeng v. GlaxoSmithKline, LLC*, No. 1:12-CV-568, 2014 WL 10077476, at *9 n.7 (M.D.N.C. Jan. 23, 2014). His discrimination claims fail for the same reasons as his federal claims, as they are subject to identical analysis. *See Chamberlain v. Securian Fin. Grp., Inc.*, 180 F. Supp. 3d 381, 405 (W.D.N.C. 2016); *Bradley v. CMI Indus., Inc.*, 17 F. Supp. 2d 491, 500 (W.D.N.C. 1998).

### Conclusion

No reasonable jury could find that Flowers has established a prima facie case or shown pretext regarding any of his claims. For the reasons discussed above, the Court should grant Electrolux's motion for summary judgment in its entirety and enter judgment in its favor.

---

[7] Kean is a comparator here too, as he does not have a known disability. (Rawat Dep. 27:19.)

This the 30th day of June 2021.

Respectfully submitted,

/s/ *Mason G. Alexander*
Mason G. Alexander (NC Bar No. 23945)
Benjamin S. Morrell (NC Bar No. 56676)
**FISHER & PHILLIPS LLP**
227 West Trade Street, Suite 2020
Charlotte, North Carolina 28202
Telephone: (704) 334-4565
Facsimile: (704) 334-9774
Email: malexander@fisherphillips.com
Email: bmorrell@fisherphillips.com

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

JOBBIE FLOWERS,

      Plaintiff,

    v.

ELECTROLUX NORTH AMERICA, INC.,

      Defendant.

Civil Action No. 3:20-CV-517-RJC-DCK

## Certificate of Service

I hereby certify that on the date listed below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notice to Plaintiff's counsel, L. Michelle Gessner, at michelle@mgessnerlaw.com.

This the 30th day of June 2021.

Respectfully submitted,

/s/ *Mason G. Alexander*
Mason G. Alexander
Attorney for Defendant
**FISHER & PHILLIPS LLP**

27