JOBBIE FLOWERS,

     Plaintiff,

v.

ELECTROLUX NORTH AMERICA, INC.,

     Defendant.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant Electrolux North America, Inc.'s ("Electrolux") motion for summary judgment is an ostrich exercise: Electrolux continues to stick its proverbial head in the sand--as it did when Plaintiff Jobbie Flowers ("Flowers") repeatedly engaged in protected activity--and conveniently ignores the plethora of disputed facts.

Flowers, a Black male, is a self-taught IT professional who worked his way up through the ranks and achieved the position of Team Lead in Electrolux's IT Department. During his first eight years of employment at Electrolux, Flowers' performance was consistently ranked as meeting or exceeding expectations. He received regular raises, bonuses, and was promoted. He got along well with his managers and colleagues. Flowers was also a community activist and approached work with the same passion he did his activism.

However, when Kopal Rawat ("Rowat") became his supervisor in January 2019, everything changed. Almost immediately, Rawat began treating Flowers differently than his non-Black peers, subjected him to increased scrutiny, and was hostile and aggressive towards him. Flowers complained to human resources ("HR") and his chain of command about Rawat's

disparate treatment. He requested additional meetings with Rawat, HR, and asked for a mediator to assist him and Rawat communicate. Electrolux failed to conduct an appropriate investigation when Flowers complained and instead permitted Rawat to place Flowers on a performance improvement plan ("PIP").

Importantly, within five days of Flowers telling Rawat he was reporting her to HR, Rawat initiated the PIP process by requesting a copy of the PIP form from HR. Rawat then used the PIP as a smoke screen to continue her discriminatory conduct. She placed Flowers under a microscope and began to paper his personnel file by documenting every perceived misstep in an effort to terminate him. She labeled Flowers, a six-foot tall Black man, as "aggressive." Despite Flowers working to achieve and meet the terms of his PIP, Electrolux cut the PIP short and terminated his employment upon his return from medical leave. Then, in an effort to cover up its unlawful discriminatory and retaliatory conduct, Electrolux engaged in a copy/paste exercise for another employee's PIP in an attempt to fabricate an after-acquired defense out of thin air.

Ample evidence exists to create a genuine dispute of material fact under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act, as amended ("ADA") and Defendant's motion for summary judgment should be denied.

## II.      STATEMENT OF FACTS

### A.      Flowers was qualified and excelled in his role.

Flowers is a career information technology ("IT") professional and gained most of his education and experience from technical training, on-the-job training, and special training provided by his employers. Ex. 1[1] (Flowers Dep.) at 12:4-8. His resume includes work for companies such as Total Audio Visual Services, Wentworth College, The Gillette Company,

---

[1] All "Ex." citations refer to the Exhibits described and filed with the Appendix in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment.

Exult, PeopleSoft Payroll, Hewitt and Associates, Transamerica, and Wells Fargo. *Id.* at 12:19-13:17, 19:22. Flowers was hired by Electrolux in May 2011 as an Application Support Analyst by Javier Balderrama. *Id.* at 21:13-17. He initially reported to Balderrama and then to Mike Daniel. *Id.* at 22:13-14. In 2015, Flowers received a promotion to Team Lead for the Application Support Team. *Id.* at 40:18-19. As team lead, he reported to the Director of IT, Brenda Simpson. *Id.* at 40:21-22; 78:9-13.

As an Application Support Analyst, Flowers was responsible for addressing issues with the .net applications and web-based applications. *Id.* at 24:11-12. If an Electrolux employee had a problem with an application, they would log a ticket to request help and then Flowers would work with the employee to resolve the issues. *Id.* at 24:15-18. There were different levels of support within the Application Support Team with increasing skill sets: level 1 was the help desk, Flowers was at level 2, and level 3 was for higher specializations. *Id.* at 25:24-25:3. Flowers also took initiative to create business process documentation, internal wiki sites, and business requirement documents. *Id.* at 27:5-14.

When Flowers was promoted to Team Lead in 2015, he was identified for the promotion by then-Director Jacob From without even applying for the role. *Id.* at 40:4-10. As Team Lead, he was responsible for managing two employees. *Id.* at 41:3-5. In 2017, Flowers was approached by Electrolux to serve as a HR business partner ("HRBP") to help implement a new performance review system called Talent One. *Id.* 41:16-24. He provided feedback on performance reviews and also participated in hiring decisions. *Id.* at 43:10-12, 44:-18. He also participated in creating user stories, which act as a guide to assist with developing applications (e.g., a way to document how applications should be developed) for applications Supplier Web and DevOps. *Id.* at 36:7-10, 38:1-15. Outside of work, Flowers regularly volunteers at Crisis Assistance Ministry at the

donations center, Lakewood Community assisting with work for homeless veterans, and with United Way's rapid re-housing project. *Id.* at 31:13-32:13.

Prior to 2019, Flowers' performance was positively rated by his supervisors. In 2012, 2013, 2014, and 2016 he received an "exceptional" or "exceeds expectations" on his annual performance reviews. Exs. B, C, D, and E. In 2017 and 2018, Director Brenda Simpson rated him as "meets expectations." Exs. F and G. In her 2017 year-end review, Simpson discussed how Flowers was "willing to adapt," and "asks for feedback and is very open to listen and adjust." Ex. F at 9. Again in the 2018 year-end review, Simpson discussed how Flowers practiced "core competencies," and that "Jobbie has done a great job to step into the team leadership role and made great effort to work on team cohesiveness and improvements over the previous year. This is in line with expectations of the team lead role." *Id.* at 13. Flowers consistently received annual raises and the only year he did not receive either a raise or a bonus was the year that the company performed poorly and no employee received a raise. Ex. 1 at 48:12-25; 164:7-11.

In addition to giving Flowers positive performance reviews, Simpson testified that when she supervised him, his performance "would be good. It would require some coaching. It would be good. It would require some coaching." Ex. 8 (Simpson Dep.) at 182:24-25. Other than these informal coachings, Simpson never felt the need to issue written performance counseling, written discipline, or place him on a performance improvement plan. *Id*. at 50:4-10, 23:1. Her testimony also affirmed that at the end of 2018, he was meeting expectations. *Id.* at 182:18.

**B.      Kopal Rawat was hired and began targeting Flowers based on his race.**

In January 2019, Kopal Rawat was hired as Electrolux's IT Manager and Flowers' immediate supervisor. Ex. 8 at 13:22, 110:4. Flowers was the only Black employee on Rawat's team. Ex. 1 at 99:19-20; Ex. 9 (Sinclair Dep.) at 176:11-17. Almost immediately, Rawat began to talk down to Flowers, exhibit animosity toward him, and treat him differently. Ex. 1 at 55:21-25.

She was "very mean," "belligerent," and exhibited "aggression." *Id.* at 58:9-15. "It was evident" and "couldn't be hidden." *Id.* at 55:25-25. Flowers was the *only* team member she micromanaged. *Id.* at 121:20-24.

This disparate treatment of Flowers and outright hostility from Rawat towards him continued for seven months, and Flowers testified that "after seven months of dealing with this and tried to resolve the issues on my own, I asked Kopal after I left the stand-up meeting, 'Kopal' -- because I wanted to be respectful of her as being my manager, I wanted to ask Kopal -- 'can you reach out to HR so we can sit down and resolve our issues?'" *Id.* at 58:16-20.

Rawat then sent an email to HR on July 19, 2019 and informed HR that Flowers wanted to reach out to them. Ex. J. Flowers responded the same day in the same email chain to request HR's help with "a challenge I am currently facing." *Id.* This set in motion a series of retaliatory actions by Rawat:

- Metadata indicates that less than two hours[2] after Flowers said he wanted to talk to HR, Rawat scheduled a meeting with Simpson to discuss "Jobbie & HR." Ex. 11 (Rawat Dep.) at 129:1-16; Ex. 12. The meeting between Rawat and Simpson took place on July 22, 2019. Ex. 11 at 127:9-25, 129:1-4.

- Rawat sent a request to Alexa Moor in HR and asked for a PIP template and Moor provided one to Rawat on July 24, 2019. Ex 13. The PIP template Moor provided had certain fields pre-populated that referred to Flowers (e.g., "senior manager") prior to sending it back to Rawat. Ex. 11 at 143:8-12, 251:20-25; Exs. 13 and 14. Logically, this means that between July 19, 2021 when Flowers said he was going

---

[2] Compare Ex. 10 (July 19, 2019 email sent at 11:01am) with Ex. 12 (calendar invite sent July 19, 2019 at 1:24pm).

to HR and July 24, 2021 when Moor sent the partially complete PIP form, Rawat spoke to HR about her intent to place Flowers on a PIP.

- Rawat knew that Moor was out of town on July 22 and July 23, 2019 and made sure to speak with both Moor and Simpson before Flowers had an opportunity to speak with HR. Moor did not email Flowers to set up a meeting until July 26, 2019. Ex. 11 at 126:18-128:25.

Moor was unable to meet with Flowers and Rawat until August 2019. Ex. 1 at 61:8. During the August meeting with Moor, Flowers made the suggestion that he and Rawat meet more frequently because Rawat did not conduct many one-on-one meetings with Flowers. *Id.* at 62:5-7, 63:4. Following the August 2019 meeting with Moor, Rawat and Flowers began to meet one-on-one at regular intervals the following week. *Id.* at 64:11-12.

Unfortunately, the one-on-one meetings did not have the desired effect. During the one-on-one meetings between Flowers and Rawat, Rawat was very "combative." *Id.* at 64:20-21. The meetings did not seem like they had anything to do with working better as a team or improving performance. *Id.* at 65:1-5. Rather the focus of the meetings appeared to be criticism and an opportunity for Rawat to create negative documentation on Flowers for his file. *Id.* at 65:23-66:5; 72:21-25. Rawat frequently "lit into" Flowers when he made suggestions. *Id.* at 70:3-4. As Flowers testified, "[i]t felt like things got worse." *Id.* at 65:10.

### C. Flowers engaged in legally protected activity.

When Rawat's disparate treatment of Flowers continued, he decided to start looking for outside assistance in the form of a mediator. *Id.* at 74:5-10. Flowers sent a message to Rawat on September 23, 2019 saying, "I think we will require a mediator in all of our one-on-one's going forward" and referenced getting "external" help. Ex. 15. He also said, "I was the Chairperson for the Diversity and Inclusion Network at Hewitt for two years. . . . so I have some experience

6

handling these types of situations." *Id.* When asked about his reference to "Diversity and Inclusion," Flowers testified that based on his experience with "diversity issues," the "EEOC came up, mediation came up."[3] Ex. 1 at 74:18-25.

After Flowers requested a mediator, he had a meeting with Simpson in September 2019 to discuss involving a mediator. Ex. 8 at 119:10-120:8. During his meeting with Simpson, she denied his request for a mediator because Electrolux was not "staffed to have a mediator" and asked Flowers to try and "work through it." *Id.* However, despite his best efforts to work in a collegial manner with Rawat, Rawat's treatment of him continued to deteriorate and he was placed on a PIP on November 8, 2019.[4]

Left with no other choice, Flowers hired an attorney who sent a demand letter on his behalf to Electrolux on November 29, 2019. Ex. 17. In the letter, Flowers' attorney informed Electrolux that Electrolux "has treated Mr. Flowers in a disparate manner based on his race" and that Electrolux's conduct "is in direct violation of the Americans with Disabilities Act." *Id.* The letter also referenced Flowers' diabetes disability. *Id.* Simpson, Rawat, and HR were all aware of the letter from Flowers' attorney and/or that a litigation hold notice was in place. Ex. 8 at 146:13-147:4; Ex. 11 at 203:1-204:5; Ex. 9 at 61:7-21.

### D.    Electrolux failed to investigate Flowers' discrimination complaints.

At no time did anyone at Electrolux investigate Flowers' complaints of race and disability discrimination: On October 1, 2019, the HR business partner assigned to Rawat's team changed to Naomi Sinclair. Ex. 9 at 69:11-17. Sinclair testified that despite being fully aware that Flowers had made multiple complaints about Rawat's treatment of him, she never reached out to him to

---

[3] Around the same time, on September 16, 2019, Flowers voiced concern that Rawat was "trying to get back at me by reprimanding me." Ex. 16 . Then on September 17, 2019, Flowers sent an email to Rawat that "it felt like retaliation" when Rawat removed his access to tools he needed to complete his job. *Id.*
[4] Details of the PIP are explained in-depth herein below.

discuss his experience. *Id.* at 150-151. In fact, after receiving the letter from Flowers' attorney, Sinclair "did nothing differently." *Id.* at 61:14-21. Similarly, Simpson testified that she was not interviewed by anyone about Flowers' allegations of race and disability discrimination. Ex. 8 at 148:11-23. She also did not participate in any way in an investigation into the allegations contained in Flowers' attorney's letter. *Id.* Simpson also was not aware of whether anyone on her team was asked about Flowers' allegations of legal violations. *Id.* at 149:10-13. Additionally, Rawat testified that she did not participate in any investigation regarding Flowers prior to his termination. Ex. 11 at 31:21-24.

### E. Electrolux puts Flowers on a Performance Improvement Plan and then Terminates him.

On November 8, 2019, Rawat placed Flowers on a PIP, and built on the form Moor had sent her on July 24, 2019. Exs. 14 and 18. The PIP was one more way that Rawat singled Flowers out. As he testified, "[f]or the eight years that I worked at Electrolux before Kopal came on board, I never had a problem with any of these things. It happened after she came on board, and she discriminated against me because I'm Black. That's the bottom line." Ex. 1 at 102:8-9.

In the PIP, Rawat alleges that Flowers had "low drive." Ex. 18. However, he was extremely driven and demonstrated his hard work ethic in his four different leadership roles at Electrolux. Ex. 19 (Flowers Decl.) ¶¶ 5-7. In fact, his work ethic and his ability to get along with everyone was the reason he was asked to take on the multiple leadership roles. *Id.* at ¶¶ 8-9. The feedback Rawat gave about Flowers' lack of "drive," "enthusiasm," and "attitude" are directly contradictory to his proven track record. Ex. 18. As Flowers testified, "all of my past performance has always been stellar. I've never had a problem with anybody on the management team ever related to performance. I've always had excellent performance reviews." Ex. 1 at 149:8-12. Prior to Rawat, no one had ever issued a PIP to Flowers. Ex. 9 at 164:8-11.

Moreover, Rawat singled Flowers out in the PIP and characterized him as defensive, impatient, and aggressive. Ex. 18. These designations are typical racial stereotypes of an "angry Black man." Ex 19 at ¶ 10. This characterization of Flowers is also contradicted by Sinclair and Simpson, who describe Flowers as not aggressive, consistently positive, and having a "positive attitude." Ex. 9 at 159:14-17, 169-22:24; Ex. 8 at 25:10.

Flowers was subject to more stringent demands and rigid parameters than anyone else on the IT team. Ex. 19 at ¶¶ 14-15. For example, everyone on the team was supposed to complete weekly status updates on Microsoft Teams but Flowers was the only one who completed the status updates. *Id.* at ¶ 15. Yet he was disciplined for *formatting* the updates incorrectly, whereas his teammates were not disciplined for their failure to complete the updates (much less placed on a PIP). *Id.* The only explanation for this disparate treatment is race. As Flowers testified, "I feel that there was more pressure put on me to get it done right the first time, no exceptions. I don't remember any of my other team members being held to the same standard that I was held to, and that's why you have all of these bullet items. . . . I'm the person that was singled out. There was nothing that I could do right, and that's because I'm Black." Ex. 1 at 117:2-12.

Flowers completed most, if not all, of the objective project-based items on the PIP. Ex. 19 at ¶¶ 4, 16-25. Still, Rawat continued to misconstrue, conflate, and make outright falsities regarding these objective performance measures. *Id.* at ¶ 18. For example, Rawat alleged at the December 5, 2019 PIP review that Flowers did not complete the Supplier Web Migration user stories, but all user stories were actually complete. *Id.*; Ex. 20. In other instances, Rawat and Flowers would jointly agree to change a deadline for a project, only for Rawat to later include the purported "missed deadline" in Flowers' PIP review. Ex. 19 at ¶ 11.

Flowers objectively achieved the parameters set forth in his PIP. *Id.* at ¶¶ 4, 16-25. However, Rawat had previously told Sinclair and Simpson that Flowers was not making any

9

progress on his PIP. Ex. 9 at 163:7-11. Based on this statement from Rawat and her recommendation, the decision was made to cut Flowers' PIP period short and terminate him. *Id.* at 163:2-5.[5] On January 22, 2020, Flowers met Rawat, Simpson, and Sinclair in the HR office for what was supposed to be his second PIP status meeting. Ex. 1 at 128:7-10; Ex. 21. Instead, he was terminated. Ex. 11 at 235:4-14.

Only one other employee was terminated by Rawat through the PIP process: Robert Kean (White) was placed on a PIP on May 19, 2020 (after Flowers had been terminated). Ex. 8 at 78:5-9. He was later terminated. However, Kean's circumstances differed from Flowers' in that Kean had been placed on a PIP previously. *Id.* at 78:14-23. Kean's long history of performance problems had resulted in Simpson asking Flowers to coach and supervise Kean before Rawat was hired. Flowers had previously coached him on his need for improved performance. Ex. 1 at 151:7-17, 152:9-14; Ex. 19 at ¶¶ 26-28. In fact, Kean's performance was so poor that he frequently crashed systems when he made updates and Flowers was surprised he had not been terminated years earlier. *Id.*

### F. Electrolux had notice of Flowers' disability.

Flowers was diagnosed with diabetes in 2015 and Electrolux was aware of his disability. Ex. 1 138:3, 147:10-9. In fact, Flowers was diagnosed through an Electrolux-sponsored blood test that occurred on Electrolux's premises. *Id.* at 143:4-13. After his blood draw results came back, another Electrolux employee had to take Flowers to the emergency room. *Id.* at 144:1-4. When Flowers returned to work following his diagnoses, he started telling "everyone, 'I just diagnosed with diabetes, didn't even know I had it.'" *Id.* at 144:19-22.

---

[5] The issue of who was the decision maker for Flowers' termination has been a moving target, with some testimony indicating Rawat (Indian) and Sinclair (Black) made the decision together. Ex. 8 at 171:12-15. This appears to be an attempt by Electrolux to couch the decision maker as the same race as Flowers. However, this is a genuine issue of material fact for the jury to decide.

On September 30 and October 1, 2019, Flowers texted Rawat that he was in the hospital. Ex. 22. Rawat, Simpson, and HR communicated on October 2, 2019 about Flowers' medical leave and Rawat advised him to contact UNUM the same day. Exs. 23 and 24. Flowers also sent Rawat a screenshot of his MyChart website regarding his hospital stay. Ex. 25. Moreover, Rawat knew that Flowers had diabetes because when he got back to work in October 2019 after being admitted to the hospital for three days with diabetic complications, he told everyone what happened at a team meeting upon his return. Ex. 1 at 147:10-19. Rawat testified that she could not remember whether Flowers disclosed his diabetes at a team meeting or not. Ex. 11 at 110:20-22. She did, however, admit to knowing he was treated at the emergency room in the fall of 2019. Id. at 177:16-20. Flowers was placed on the PIP on November 8, 2019, mere weeks after he was hospitalized. Ex. 18.

Furthermore, Electrolux was also on notice of Flowers' disability because his attorney's November 29, 2019 demand letter explained his "diabetes flare up" that caused him to miss three days of work in September. Ex. 17; Ex. 9 at 139:24-140:3.

On December 19 and 20, 2019, Flowers informed Electrolux that he was sick and would be out of work. Ex. 26. On January 3, 2020, Rawat informed Sinclair and Simpson that Flowers was, again, out sick and said that due to his vacation and sick leaves, she was unable to evaluate his performance on the PIP. Ex. 27. Rawat informed Flowers on January 6, 2020 that due to his vacation and sick leave, his PIP evaluation period was being extended to January 22, 2020. Ex. 28. Flowers was again out sick on January 13, 14, and 15, 2020 and informed Rawat of the same. Exs. 29, 30, and 31. Sinclair also knew he had been out sick and had been treated at an urgent care. Ex. 9 at 160:12-25. Flowers' employment was terminated one week after he returned to work, on January 22, 2020.

III. ARGUMENT

Summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995). "Judgment as a matter of law is proper only if 'there can be but one reasonable conclusion as to the verdict." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The Supreme Court has made it clear that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on summary judgment." *Id.* at 255.

Summary judgment may only be granted if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Id.* at 248-50. Defendant, as the moving party, has the initial burden to show a lack of evidence supporting Flowers' claims. *Shaw v. Stroud*, 13 F.3d. 791, 798 (4th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). When reviewing this motion for summary judgment, the Court must view all of the evidence in the light most favorable to Flowers, the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Moreover, all of Flowers' evidence must be presumed credible. *See Shaw*, 13 F.3d at 798 (citations omitted).

As discussed in greater detail below, summary judgment should be denied because when the evidence is taken in a light most favorable to Flowers, it is clear that Electrum has not met its initial burden and genuine disputes of material fact exist as to all of his claims. Summary judgment would be improper for either or both of these reasons.

**A. A reasonable jury could rationally find that Electrolux Retaliated Against Flowers in Violation of Title VII.**

For retaliation claims, a plaintiff's prima facie case entails proof of the following elements: (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) a causal link between the protected activity and the adverse action. *Mascone v. Am. Physical Soc'y, Inc*., 404 F. App'x 762, 765 (4th Cir. 2010). Flowers has proffered evidence from which a reasonable jury could find for him on all elements.

**1. Flowers can make out a prima facie case of retaliation.**

**a. Flowers engaged in legally protected activity.**

Under Title VII, "[p]rotected opposition activities include both 'complaints about suspected violations' and 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities.'" *Stewart v. Morgan State Univ.*, 2015 U.S. App. LEXIS 4845, *4 (4th Cir. 2015). "The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co*., 647 F.2d 441, 448 (4th Cir. 1981) (citing *Sias v. City Demonstration Agency*, 588 F.2d 692, 694-96 (9th Cir. 1978)).

Employees do not have to use the exact magic words in order to invoke the protection of Title VII's opposition clause. For example, in *Emami v. Bolden*, 241 F. Supp. 3d 673, 684 (E.D. Va. 2017), the court held that the following two emails constituted protected activity under Title VII's opposition clause:

> The Plaintiff's first email invokes equal employment opportunity laws in the most general sense. However, while there is no specific reference to discrimination based on religion or national origin, the Plaintiff's reference to anti-discrimination laws in general, especially in the context of the whole statement, would place a reasonable reader on notice that the Plaintiff was concerned that his employer could be discriminating against him, in violation of anti-discrimination laws. Therefore, the statement in the email constitutes "protected activity" under the first prong of the Plaintiff's prima facie case.

13

The second email, viewed in the context of the situation, also invokes equal employment laws. The Plaintiff requested that an EEO representative participate in the Research Directorate. . . . This email would also place a reasonable reader on notice that the Plaintiff was concerned that his employer could be unlawfully discriminating against him.

*Id.* at 684.

In *Emami*, the employee's general reference to equal employment opportunity laws and an "EEO representative," when taken in context placed the employer on notice that the employee was concerned about unlawful discrimination.

Here, Flowers--the only Black man on Rawat's team--repeatedly complained about Rawat's hostility and retaliation. He also requested the assistance of an outside mediator and invoked "diversity and inclusion" language in his request on September 23, 2019. Within this context, a reasonable reader would be on notice that Flowers was complaining of unlawful discrimination. Thus, Flowers engaged in protected activity *prior* to being placed on the PIP and a reasonable juror should have the opportunity to evaluate the evidence. Furthermore, Flowers *did* expressly invoke race and disability discrimination language in his attorney's demand letter on November 29, 2019 and Electrolux has conceded that this action constituted protected activity. Flowers' complaints did more than simply refer to unfair treatment. He specifically referenced "diversity and inclusion" in his September 23 communication and then his attorney's demand letter referenced race discrimination and disability discrimination expressly.

### b. Flowers' can establish the requisite causal connection.

Electrolux argues that Flowers must satisfy a stringent "but-for" causal standard. However, as explained in *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 251 (4th Cir. 2015), cited by Electrolux, this only means that Flowers need only show that retaliation was

14

the "real reason" for the termination. *Id.* at 252-253 ("In other words, the statements 'the real reason for Foster's termination was her employer's retaliation' and 'Foster would not have been terminated but for her employer's retaliatory animus' are functionally equivalent.")

Electrolux has not established, by undisputed facts, that retaliation was *not* the real reason. Indeed, Electrolux's entire argument hinges on ignoring facts that are right there in the record provided by Electrolux itself. For instance, Electrolux first falsely claims that the *only* protected activity Flowers engaged in was the demand letter from Flowers' attorney. Electrolux then argues Flowers was already placed on a PIP at that time so there can be no causation. However, Flowers proffered evidence that he complained of race discrimination *before* the PIP and that *both* the PIP *and* the termination were done in retaliation for engaging in that protected activity.

It is well-settled that a written warning can constitute an adverse employment action for retaliation purposes. *Blakney v. N.C. A&T State Univ.*, 2019 U.S. Dist. LEXIS 45794, *50 (M.D.N.C., March 20, 2019). Indeed, the United States Supreme Court has recognized that what constitutes an adverse action in the Title VII retaliation context is broader than in the substantive Title VII discrimination context. *Burlington N. & Santa Fe*, 548 U.S. 53, 64 (citation omitted) ["[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."]. As such, *Blakney* concluded, "the court necessarily finds that the [. . .] written warning was an adverse employment action here as well." The Supreme Court in *Burlington, supra,* noted that the adverse action component of Title VII's anti-retaliation provision can be satisfied by showing that the employer took "materially adverse" action in response to an employee engaging in a protected activity "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"). *Id.* at 64 (internal quotation omitted). Applying the "materially

15

adverse action" standard, the district court in *Emami* determined that a PIP was a materially adverse action when it "was actually implemented, and it imposed conditions with which his failure to comply ultimately led to termination of employment." *Emami v. Bolden*, 241 F. Supp. 3d 673, 687 (E.D. Va. 2017). The court further analyzed, "[f]urther, by virtue of the Plaintiff's placement on the PIP, he became subject to reduction in grade or removal action without being afforded another PIP. These conditions, particularly in light of the requirements imposed by the PIP, could dissuade a reasonable employee from making a charge of discrimination." *Id.* (internal citations omitted).

Thus, there is no question that Flowers' PIP itself was a materially adverse action because the PIP was actually implemented and proposed conditions that Electrolux alleges ultimately led to his termination. Here, Flowers can certainly show that retaliation for complaining about discrimination is the "real reason" for both the PIP and the termination. a causal relationship between his protected activity and Electrolux's retaliation. As soon as Flowers indicated on July 19, 2019 that he was going to HR about Rawat, Rawat began retaliating against him. Rawat emailed Simpson to discuss "Jobbie & HR" approximately two hours later. She contacted Moor in HR, who provided her with a partially completed PIP document on July 24, 2019 (within five days of Flowers saying he was going to HR). Rawat then used the one-on-one meetings to paper Flowers' personnel file, in retaliation.

> ## 2. Electrolux did not have a legitimate, non retaliatory reason for firing Flowers and Flowers can show pretext.

Electrolux claims that its legitimate, non-retaliatory reason for placing Flowers on a PIP and then terminating Flowers was his poor work performance. However, there are genuine issues of material fact as to whether Flowers was performing poorly prior to being placed on a PIP or whether Rawat, as part of her discrimination and retaliation, scrutinized and micromanaged

Flowers and exaggerated any perceived issued. There is also ample evidence that Flowers was an exceptional employee who was consistently praised, promoted and rewarded for his performance at all times before Rawat became his supervisor.

The evidence also shows that the proffered reasons for putting disciplining Flowers with a PIP, terminating the PIP early and terminating Flowers were pretextual. Courts in this District consider temporal proximity concerning pretext. *Ramos v. Carolina Motor Club, Inc.*, No. 3:17-cv-00212-RIC-DSC, 2018 U.S. Dist. LEXIS 102381, 2018 WL 3040028, at *8-*9 (W.D.N.C. June 19, 2018) (unpublished); *E.E.O.C. v. Safelite Glass Corp.*, No. 4:10-CV-102-F, 2012 U.S. Dist. LEXIS 112042, 2012 WL 3266333, at *8 (E.D.N.C. Aug. 9, 2012) (unpublished); *O'Neill v. Henderson Cty. Hosp. Corp.*, CIV. 1:04CV68, 2005 U.S. Dist. LEXIS 41049, 2005 WL 3797394, at *4 (W.D.N.C. June 21, 2005). Electrolux argues that the two-month gap between the letter from Flowers' counsel and his termination is insufficient as a matter of law to establish pretext. The only case Electrolux relies on for this proposition is *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005). But the language from that opinion that Electrolux quotes demonstrates that two-months does not destroy temporal proximity as a matter of law in every case. Indeed, as Electrolux itself concedes, the Fourth Circuit merely "noted that a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to *weaken significantly* the inference of causation.'" Electrolux's Memorandum of Law at p. 16, emphasis added. *Horne* does not hold that a two-month gap can never establish temporal proximity for purposes of pretext.

On the contrary, courts in this Circuit have found that two months, and even three months, is sufficient to establish temporal proximity. *See e.g., King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (a little over two months); *Suggs v. 7-Eleven, Inc.*, 2015 U.S. Dist. LEXIS 80930 (D. Md., June 23, 2015) (three months).

Lastly, Electrolux again artificially narrows the analysis and thus cannot succeed on summary judgment. Electrolux only argues that the temporal proximity between the letter from Flowers' attorney and Flowers' termination is insufficient. It fails to even consider the temporal proximity between Flowers' first complaints of discrimination and the decision to place him on the PIP in the first place, which was an adverse employment action as well. The Complaint specifically alleges the PIP was retaliatory. Complaint at ¶ 27. As soon as Flowers indicated on July 19, 2019 that he was going to HR about Rawat, Rawat began retaliating against him. Rawat emailed Simpson to discuss "Jobbie & HR" approximately two hours later. She contacted Moor in HR, who provided her with a partially completed PIP document on July 24, 2019 (within five days of Flowers saying he was going to HR). Rawat then used the 1:1 meetings to paper Flowers' personnel file, in retaliation. In addition, Flowers expressed concerns about Rawat's retaliation on September 16 and 17, 2019. He then requested the help of an external mediator on September 23, 2019 and referenced his "experience handling these types of situations" through his works as the "Chairperson for the Diversity and Inclusion Network." He was placed on his PIP approximately five weeks later, on November 8, 2019.

Electrolux cannot entirely ignore these facts and still succeed on summary judgment.

**B.    A reasonable jury could rationally find Electrolux discriminated against Flowers on the basis of race in violation of Title VII.**

### 1.    Electrolux failed to meet its initial burden as to most of Flowers' race discrimination allegations.

Flowers' Complaint asserts a first claim for relief for discrimination and retaliation on the basis of race, alleging: "Defendant's discriminatory actions included, but were not limited to (1) limiting, segregating, or classifying Plaintiff in a way that adversely affected his opportunities or status as an employee because of his race; (2) utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of his race; (3) singling Plaintiff

out for disparate and harsher treatment because of his race (3) [sic] retaliating against Plaintiff for making charges against his employer and opposing unlawful practices; and (4) [sic] discharging Plaintiff based on his race." Complaint at paragraph 36. Despite these five specifically enumerated types of discriminatory conduct, Electrolux chose to address only two - retaliation and disparate treatment. Electrolux cannot ignore material allegations in the Complaint and still succeed on summary judgment.

Furthermore, even as to the disparate treatment claim, Electrolux fails to show it is entitled to summary judgment.

> ### 2. Electrolux failed to meet its initial burden as to Flowers' disparate treatment discrimination claim and there are triable issues in any event.

To establish a prima facie case of disparate treatment discrimination under Title VII, Flowers must show: (1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *Hurst v. District of Columbia*, 681 Fed. Appx. 186, 190 (4th Cir. 2017).

> ### a. Electrolux failed to meet its initial burden because it unilaterally narrowed Flowers' allegations and deposition testimony.

Electrolux completely flips the analysis of the elements on its head by first unilaterally deciding that there is only one comparator, Robert Kean. But Flowers did not identify Kean as a comparator and certainly not as the only comparator. The allegations in the Complaint are not narrowed down to Kean. Complaint at ¶¶ 31-32. Flowers' deposition testimony likewise showed numerous instances in which he was treated differently than his white coworkers. Ex. 1 at 117-126, 149-151. In fact, Flowers never identified Kean specifically; Electrolux did in order to try to

show that Flowers and Kean were treated the same. *Id.* at 151-152. Yet, Electrolux's motion for summary judgment completely ignores these allegations and the evidence. Electrolux cannot succeed on summary judgment by selecting its own "comparator" and then proceeding to show why Kean is not a proper comparator when Flowers did not choose him as one. Instead, Electrolux needed to demonstrate that Electrolux treated Flowers the same as his colleagues who were not Black.

Furthermore, Electrolux's own evidence shows that Kean was terminated in June of 2020, *after* Flowers filed the instant lawsuit claiming he was treated differently from white employees. It is not surprising that it now relies so heavily on Kean as the only comparator. The defense was entirely contrived. Electrolux disciplined Kean solely as damage control--to retroactively try to detract from the appalling disparate treatment of Flowers.

Electrolux thus fails to meet its initial burden of showing there is no genuine dispute of material fact regarding Flowers' disparate treatment claim.

> **b. Kean's performance issues were far worse than Flowers' purported issues and Electrolux's disciplinary measures were not the same for Kean and Flowers.**

Electrolux concedes that it must show Flowers' and Kean's misconduct was comparable in seriousness but it fails to do so. Yet the only evidence it presents are the statements in the form PIP. Flowers' purported misconduct was not comparable to Kean's misconduct. Rawat's testimony shows that Kean's performance issues were far more substantive and including making errors continuously. Ex. 11 at 26-27. Whereas, the evidence submitted by Electrolux shows that Flowers' purported performance issues related to Rawat's perceptions about how Flowers spoke to her, behaved around her and reacted to her and not sufficiently sharing updates with her or prioritizing the way she wanted him to and missing team meetings. *Id.* at 47-48; 56-58; 83-84, 180, 191, 195. None of Rawat's complaints were truly performance related in any substantive

sense. Rather, they were all related to Rawat's perception of Flowers as a Black man and Flowers' reaction to being singled out and mistreated because of his race.

In addition, the disciplinary measures against Flowers were more severe than those against Kean. As Electrolux freely admits, "the only difference was timing." But a jury could reasonably infer from that "timing" difference that the disciplinary measures were not the same. Kean was only put on a PIP for 60 days, while Flowers was put on a PIP for 90 days. Then, Flowers' PIP was *cut short* in order to terminate him more quickly, while Kean's PIP *was extended* to allow him more time to improve. This alone precludes summary judgment.

### 3. Pretext is part of the disparate treatment analysis.

Electrolux repeats its previous arguments related to pretext. However, **s**ince Flowers succeeds in raising a genuine issues of material fact as to disparate treatment, he has already shown he can establish pretext as well. This is because comparator evidence is one way to show pretext. *Laing v. Fed Express Corp*., 703 F.3d 713, 719 (4th Cir. 2013) (noting that comparator evidence is "especially relevant" to the issue of pretext).

### C. A reasonable jury could rationally find that Electrolux discriminated against Flowers based on his disability.

For a discrimination claim under the ADA, Flowers must prove that: (1) he is disabled; (2) he suffered an adverse employment action; (3) he was performing his job at a level that met his employer's reasonable expectations; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995); *Laird v. Fairfax Cty.*, 978 F.3d 887, 896 (4th Cir. 2020). Electrolux only disputes the third and fourth elements. Thus, the analysis will focus on the same.

### 1. Flowers can make out a prima facie case of disability discrimination.

### a. Flowers' job performance met Electrolux's reasonable expectations.

Electrolux alleges that Flowers' performance was not meeting his employer's reasonable expectations. However, Flowers has proffered ample evidence such that a genuine dispute of material fact exists: Flowers was promoted to team lead; he received multiple raises and bonuses; he assumed four roles within Electrolux, one of which was HRBP; his performance reviews *prior* to Rawat becoming his supervisor were all positive; he had never been placed on a PIP previously. Based on these facts, a reasonable jury could certainly determine that he was performing at a level that met Electrolux's reasonable expectations.

### b. Flowers can show an inference of disability discrimination.

Again, temporal proximity is sufficient evidence of causality to establish a prima facie case if the temporal proximity is very close. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274, 2001). Evidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to satisfy the less onerous burden of making a prima facie case of causation. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998)

Electrolux attempts to argue it was unaware that Flowers had a disability, and therefore his ADA claim fails. However, ample evidence exists that Electrolux *was* aware of Flowers' disability at the time of his termination. Flowers repeatedly informed Rawat, who passed the information to HR, that he was hospitalized, at the emergency room, or at urgent care. Moreover, Rawat and HR were aware enough to refer Flowers to UNUM, their third party benefits administrator. A reasonable jury could rationally find that Electrolux knew of Flowers' disability.

Electrolux next argues there is no inference of discrimination because the time period between the attorney's demand letter (November 29) and his termination (January 22) are too far

apart. In so arguing, Electrolux neglected to acknowledge the attorney demand letter was not Flowers' only ADA protected activity--he also took multiple sick leaves due to his disability.

Approximately five weeks passed between Flowers' September 2019 hospital stay, his informing Rawat of his illness, and her placing him on a PIP. Flowers was again out sick with diabetes complications on December 19 and 20, 2019, January 3, 2020, and January 13-15, 2020. One week after Flowers returned from a three-day medical emergency absence, he was terminated on January 22, 2020. Additionally, Rawat referenced Flowers' numerous sick leaves when she made the decision to postpone his 60 day PIP review (which ultimately turned into his termination meeting). These close temporal proximities are sufficient to create an inference of discrimination. *See e.g.*, *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity alone can create a genuine dispute to causation); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 575 (4th Cir. 2015) (denying summary judgment based on three week temporal proximity between disclosing disability and termination); *Watson v. Fairfax Cty.*, 297 F. Supp. 3d 591, 603 (E.D. Va. 2018) (temporal proximity of ten days between disclosing disability and termination was sufficient to create an inference of disability discrimination); *Bradford v. Molina Healthcare of S.C., LLC*, 2020 U.S. Dist. LEXIS 11392 at *13 (D.S.C., January 23, 2020) (denying summary judgment where two months after requesting accommodation to attend physical therapy and one month after requesting continuous FMLA leave was sufficiently close to create issue for the jury as to causal connection).

Further, Electrolux's did not properly train its managers on disability accommodations, disability discrimination, or the law. When asked about the ADA, Rawat testified that she did not know what the ADA was and could not remember if she had been trained on it. Ex. 11 at 22:9-14. She never received training about medical leaves as a manager. *Id.* at 22:25-23:4. Moreover,

no one at Electrolux reached out to Flowers to determine if his frequent absences were related to his disability or if he required an accommodation. Ex. 9 at 140:4-8, Ex. 8 at 154:2-13.

### 2. Electrolux did not have legitimate, non-discriminatory business reason and Flowers can show pretext.

Electrolux's assertion that Flowers was not meeting performance expectations is not a legitimate non-discriminatory business reason. *See e.g., Carr v. Mike Reichenbach Ford Lincoln, Inc.*, 2013 U.S. Dist. LEXIS 42501 at *15 (D.S.C., March 26, 2013) (denying summary judgment as to ADA claim when defendant relied primarily on the evidence that plaintiff was allegedly failing to meet Defendants' legitimate expectations as its LNDR and holding "when viewing the evidence in a light most favorable to Plaintiff, Defendants have failed to produce a *legitimate*, non-discriminatory reason for Plaintiff's termination").

Even assuming Electrolux's LNDR is legitimate, Flowers may establish pretext by showing the defendant's explanation is "unworthy of credence" or by offering other forms of circumstantial evidence "sufficiently probative" of intentional discrimination or retaliation. *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). "Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

Thus, there is a jury issue as to pretext on Flowers' ADA claim because all of the evidence Flowers proffered for his prima facie case should be taken into consideration: Flowers' alleged sudden decline in performance; temporal proximity between Flowers' medical leaves and his protected activity; Rawat's reference to his sick leaves when deciding to move his PIP-turned-termination meeting; and Rawat's including items in Flowers' PIP that correspond with

his sick leaves. All evidence together, when taken in a light most favorable to Flowers, creates a genuine issue of material fact as to pretext.

## IV.    CONCLUSION

For the aforementioned reasons, a genuine dispute of material fact exists as to Flowers' Title VII retaliation claim, Title VII discrimination claim, and his ADA discrimination claim and Electrolux's motion for summary judgement should be denied.

Respectfully submitted this 28th day of July 2021.

*/s/ L. Michelle Gessner*
L. Michelle Gessner, NCSB #26590
Nicole K. Haynes, NCSB #47793
GESSNERLAW, PLLC
602 East Morehead
G. G. Galloway House
Charlotte, North Carolina 28202
Tel: (704) 234-7442; Fax: (980) 206-0286
Email: michelle@mgessnerlaw.com
         nicole@mgessnerlaw.com

*Attorneys for Plaintiff*