UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JOBBIE FLOWERS,<br><br>        Plaintiff,<br><br>v.<br><br>ELECTROLUX NORTH AMERICA, INC.,<br><br>        Defendant. | Civil Action No. 3:20-CV-517-RJC-DCK |

### Reply in Support of Motion for Summary Judgment

In addressing the arguments raised by Plaintiff Flowers in his response brief, this reply begins by discussing issues common to more than one of Flowers' claims and then proceeds to individual issues regarding specific claims.

### I. Flowers' Unsupported, Self-Serving Statements Regarding His Work Performance Cannot Defeat Summary Judgment.

Flowers attempts to create a genuine dispute of material fact as to several issues with nothing more than testimony from his own deposition or declaration. But "[a] plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a *prima facie* case of discrimination" and insufficient to defeat summary judgment. *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th Cir. 2004). This is especially true where, as here, the "Plaintiff has submitted a declaration that appears to contest portions of h[is] earlier testimony" during a deposition. *Hartman v. Prospect Mortg., LLC*, 11 F. Supp. 3d 597, 603 n.4 (E.D. Va. 2014). For example, in his declaration, Flowers attacks the numerous specific requirements and assignments contained in his initial PIP document, claiming that the "[t]he PIP requirements were a moving target and some items in the PIP were contradictory." (D.E. 17-19 at 4.) But during his deposition, he admitted

1

that the specific expectations listed in the PIP were "reasonable." (Flowers Dep. 97:13, 98:8, 98:15, 98:17, 98:20, 101:19, 102:22, *available at* D.E. 13-5 at 18–21.)

Flowers fails to offer a single piece of evidence—other than his own testimony—to contradict the numerous documented, and corroborated instances of his poor work performance during 2019 and early 2020. For example, Flowers claims that the second PIP document's account of the January 10, 2020 one-on-one—during which he admitted to doing almost no work for the better part of a week—is "improperly characterize[d]" and takes his words "out of context." (D.E. 17-19 at 7–8.) But that document's account squares with both Rawat's and Sinclair's accounts of that meeting. (*See* D.E. 13-1 at 9.) Based on their observations at the time, they each decided that Flowers should be fired based on his failure to show that he had been working during that time.

Flowers briefly argues that Electrolux did not have a legitimate, nondiscriminatory reason for firing him, but this has no basis in fact or law. (*See* D.E. 16 at 24.) Courts have repeatedly held that a worker's failure to meet his employer's "legitimate performance expectations" qualifies as a legitimate, nondiscriminatory reason under step two of *McDonnell Douglas*. *See Mabry v. Capital One, N.A.*, No. GJH-13-02059, 2014 WL 6875791, at *5 (D. Md. Dec. 3, 2014) (collecting cases). "The defendant's burden of production in this context is not onerous." *Shell v. Tyson Foods, Inc.*, No. 5:15-CV-00037-RLV-DCK, 2016 WL 4490716, at *7 (W.D.N.C. Aug. 25, 2016); *see EEOC v. W. Elec. Co.*, 713 F.2d 1011, 1014 (4th Cir. 1983) ("The employer is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action."). Electrolux has more than satisfied it here. (*See generally* D.E. 13-2, 13-3, 13-4, 13-6, 13-7, 13-8, 13-9, 13-19, 13-20.) Electrolux assigned Flowers specific tasks that he failed to complete, and specific deadlines that he failed to meet. He was unable to satisfactorily describe the work he did over a four-day period. These are legitimate reasons for termination.

Flowers also points to his promotion and his positive performance reviews in previous years as evidence that Rawat created a "smoke screen" for her alleged discriminatory conduct by documenting his poor performance. (D.E. 16 at 2, 4, 22.) But his prior performance provides little insight into what his performance was like during a wholly separate time period. And a closer examination of Flowers' performance reviews year over year shows a consistent downward trend. After a few years of receiving the highest rating of "exceptional," he received the second highest rating of "exceeds expectations" (under what appears to be a new rating system) for 2016. (*See* D.E. 17-2 at 9; 17-3 at 9; 17-4 at 8; 17-5 at 11.) Then, for 2017 and 2018, his performance slipped further. He received a rating of "meets expectations" for both years—the middle option out of five. (D.E. 17-6 at 12; 17-7 at 16.) This was during the time Brenda Simpson was his direct manager. She explained the issues with Flowers' performance she observed during these years, as discussed in Electrolux's initial memorandum. (*See* D.E. 13-1 at 3–4.) And these issues were similar to those Rawat observed after she became his manager. Rawat's testimony shows Flowers' performance slipped once again, this time below a level that Electrolux was willing to accept. This shows there was no suspicious, "sudden decline in performance," as Flowers alleges. (D.E. 16 at 24.) The decline, and the issues causing it, started long before Rawat entered the picture.

Flowers has submitted no evidence showing that his performance during 2019 and early 2020 was any different from what Rawat, Sinclair, and Simpson each testified they observed: unsatisfactory. And their testimony is entirely consistent with the PIP documents' contemporaneous accounts. Flowers' word is not enough to dispute Electrolux's evidence. *Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 337 (4th Cir. 2013) (per curiam).[1]

---

[1] Flowers attempts to show discriminatory animus on Rawat's part by characterizing her testimony as to his "defensive, impatient, and aggressive" behavior as untrue and "typical racial stereotypes

## II. Flowers' "Cat's Paw" Theory of Discrimination Fails Because Simpson and Sinclair Had Independent Knowledge of His Poor Performance.

Three Electrolux employees collectively made the decision to terminate Flowers' employment on January 22, 2020: Kopal Rawat (his direct supervisor), Brenda Simpson (the Director of IT Operations and Rawat's supervisor), and Naomi Sinclair (the HR Business Partner for IT). (Simpson Decl. at 2, *available at* D.E. 13-8 at 2; *see* D.E. 13-1 at 3–5, 7.) Simpson, the ranking member of the three, explained that "[i]f one of the three of us had disagreed with the other two regarding that decision, Flowers' employment would not have been terminated at that time." (D.E. 13-8 at 2.) Flowers has submitted no evidence to contradict this, despite opining that "[t]he issue of who was the decision maker for Flowers' termination has been a moving target." (*See* D.E. 16 at 10 n.5.) His accompanying citation to Simpson's deposition merely confirms that she did not "decide to terminate Jobbie Flowers on [her] own by [her]self" and that she received "recommendation[s] to terminate" from both Rawat and Simpson. (Simpson Dep. 171:4, 171:12, *available at* D.E. 17-8 at 16.)

In his response brief, Flowers does not appear to argue that Simpson or Sinclair discriminated against him on the basis of race or disability. Indeed, Sinclair and Flowers are both African American, and Flowers testified he had a "[g]reat relationship with Brenda Simpson." (Flowers Dep. 55:8, *available at* D.E. 13-5 at 10.) Flowers limits his overt accusations of discrimination to

---

of an 'angry Black man.'" (D.E. 16 at 9.) But Simpson also observed Flowers exhibiting "aggressive" behavior before Rawat was hired. (Simpson Dep. 22:13, *available at* D.E. 13-4 at 5.) During team meetings, he would express "[f]rustration with being questioned," speak in a "raised tone," and provide "[n]egative, not positive feedback." (*Id.* 22:20.) Other team members complained to Simpson about Flowers' behavior on multiple occasions. (*Id.* 24:13, 36:21, *available at* D.E. 13-4 at 7, 10.) Once, several of them complained to Simpson about the way Flowers spoke to another team member who was late on "delivering some task" concerning a project they were both working on. (*Id.* 49:20, *available at* D.E. 13-4 at 12.) Flowers offers nothing more than his own testimony to rebut all of this evidence and thus cannot create a genuine dispute of material fact. And, in any event, Flowers was fired for performance issues, not behavioral ones.

Rawat. (*See* D.E. 16 at 4–6, 8–10.) This makes it much more difficult for Flowers to prove causation, a necessary element of his prima facie burden for each of his claims. Even if Flowers could show that Rawat was motivated by discriminatory animus—which he cannot do—Rawat's decision that Flowers should be fired was not a sufficient condition for Electrolux to terminate his employment. Simpson and Sinclair both had to make that same decision as well.

It's true that "a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). But to the extent Flowers relies on a cat's paw theory here—presumably arguing that Sinclair and Simpson merely rubber stamped Rawat's recommendation to fire him—it fails here for two reasons. First, Flowers must show that Rawat harbored a "discriminatory animus" against him, which he cannot do for the reasons explained in Electrolux's initial memorandum and this reply. *See Omanovic v. Tyson Foods, Inc.*, No. 5:13-CV-00100-DSC, 2014 WL 3109241, at *5 (W.D.N.C. July 8, 2014).

Second, Flowers also must show that the other two "decisionmaker[s] acted in accordance with [Rawat's] decision without [themselves] evaluating the employee's situation." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). He cannot do so because Sinclair and Simpson evaluated Flowers' poor work performance themselves and exercised their independent judgment. They attended all three PIP meetings. (*See* D.E. 13-1 at 7–10.) Sinclair attended the January 10, 2020 one-on-one with Rawat and Flowers—after which she decided that Flowers' employment should be terminated. (*See id.* at 9.) And Simpson assigned tasks to Flowers directly during the PIP, yet despite Simpson's reminders, Flowers did not complete the tasks. (*See* D.E. 13-19 at 7, 10–11.) Simpson also relied on her previous experiences as his direct manager for two

5

years. (*See* Simpson Decl. at 1–2, *available at* D.E. 13-8 at 1–2.) Thus, their decision that Flowers should be fired was not a "rubber stamp" of Rawat's recommendation. *Llampallas*, 163 F.3d at 1249; *see Kendrick*, 220 F.3d at 1231–32. Accordingly, any cat's paw theory fails.

**III. Temporal Proximity Alone Is Not Enough to Satisfy Flowers' Burden Under *McDonnell Douglas*.**

To survive summary judgment, Flowers must produce evidence allowing a reasonable jury to conclude that but for his race or protected conduct, Electrolux would not have fired him. *See Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016); *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 249, 252 (4th Cir. 2015). Flowers attempts to do so by arguing that the two-month gap between sending the attorney demand letter—which accused Electrolux of race discrimination and included information about his disability for the first time—and his firing supports his disability discrimination and Title VII retaliation claims. (D.E. 16 at 16–18, 22–24.) But "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (citing cases in which three- and four-month periods were too long).

Neither case cited by Flowers supports an inference of discrimination based on the timing here. In *King v. Rumsfeld*, the court explicitly noted that the two and a half months between the protected activity and the termination were "sufficiently long so as to weaken significantly the inference of causation between the two events." 328 F.3d 145, 151 n.5 (4th Cir. 2003). It nevertheless found that "this length of time does not undercut the inference of causation enough to

render King's prima facie claim unsuccessful" because of the "context of this particular employment situation."[2] *Id.* And ultimately, the court affirmed the district court's grant of summary judgment in favor of the defendant employer. *Id.* at 154.

By contrast, the context of this "particular employment situation" does not support an inference of discrimination from the two-month gap between Electrolux receiving the attorney demand letter and firing Flowers. Critically, Flowers had already been placed on a PIP and Electrolux had already documented numerous instances of his poor work performance before it had any knowledge of Flowers' disability or any complaint by him of race discrimination. The termination of Flowers' employment proceeded in accordance with the initial PIP document, which warned that "[t]he 90-day period of this plan should not be construed as a guarantee of employment for this period. Should your performance show further deterioration . . . your employment might be terminated prior to the end of the 90-day performance improvement plan." (D.E. 13-19 at 5.) When Flowers' performance failed to improve *at all* after two and a half months, Electrolux fired him.

*Suggs v. 7-Eleven, Inc.* is also easily distinguished. No. CIV.A. DKC14-1903, 2015 WL 3891949 (D. Md. June 23, 2015). There, the employer placed the plaintiff on a PIP *after* he engaged in protected activity and did so in a way that "significantly departed from its own Progressive Discipline Policy." *Id.* at *9. The plaintiff successfully alleged "other facts that are probative of retaliatory animus" as well. *See id.* None of these circumstances are present here. The PIP came before any protected activity by Flowers, Electrolux followed its established written policies when

---

[2] Specifically, the plaintiff's supervisors had "committed to ongoing reviews of King's performance that set the end of the academic school year as the natural decision point, thus making likely that any discharge, lawful or unlawful, would come at that time." *King*, 328 F.3d at 151 n.5. It thus appears that the plaintiff was fired before the end of the school year, but the court's opinion does not make this entirely clear. *See id.* at 147–48. The district court's opinion is not available on any research service like Westlaw. And the docket on PACER does not include copies of the filings.

it placed him on a PIP, and Flowers has no other evidence to support an inference of discrimination.

Beyond that, "intervening events occurred between Plaintiff's complaints and h[is] termination that had a direct bearing on the adverse employment action." *Walker v. City of Clemson*, No. 8:15-cv-00301-MGL-JDA, 2016 WL 11423509, at *9 (D.S.C. May 10, 2016) (report and recommendation), *adopted*, 2016 WL 3536692 (D.S.C. June 29, 2016). Specifically, Flowers' work performance—already unsatisfactory, hence the PIP—declined even further, culminating in the January 10, 2020 meeting revealing that he had basically stopped working altogether. (*See* D.E. 13-1 at 9.) This "intervening event[ ] erode[s] any causal connection suggested by the temporal proximity of [Flowers'] protected conduct and h[is] layoff." *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 852 (8th Cir. 2005) (citation and quotation marks omitted).

Flowers' case is of the ordinary sort in which a two-month gap between the protected activity and termination "weaken[s] significantly" any inference of causation from temporal proximity. *King*, 328 F.3d 145, 151 n.5. And the intervening decline in Flowers' performance weakens it even further. With no other evidence to prop it up, Flowers fails to prove causation.

## IV. Flowers' Title VII Claims

### A. Flowers' email mentioning "diversity and inclusion" does not constitute protected activity.

In support of his Title VII retaliation claim, Flowers argues that his September 23, 2019 email mentioning "[d]iversity and [i]nclusion" put Electrolux on notice that he was complaining about race discrimination and thus engaging in protected activity. (D.E. 16 at 13–14; *see* D.E. 13-17 at 2.) Electrolux explained in its initial memorandum of law why this is not so and will not repeat those arguments here. (*See* D.E. 13-1 at 12–13.) But while Flowers highlights that no "magic words" are necessary for a statement to qualify as protected activity, Title VII nevertheless "requires that employees provide some kind of notice to their employer that they are complaining

about prohibited practices covered by the statute." *Mixon v. Charlotte-Mecklenburg Sch.*, No. 3:11-CV-228-MOC-DSC, 2011 WL 5075808, at *6 (W.D.N.C. Aug. 5, 2011) (report and recommendation), *adopted*, 2011 WL 5075622 (W.D.N.C. Oct. 26, 2011); (*see* D.E. 16 at 13). And the substance of such a complaint must "place a reasonable reader on notice that the Plaintiff was concerned that his employer could be discriminating against him, in violation of anti-discrimination laws." *Emami v. Bolden*, 241 F. Supp. 3d 673, 683 (E.D. Va. 2017).

Flowers' email utterly failed to do so. His attempt to harmonize his case with *Emami* falls flat because the plaintiff there explicitly invoked anti-discrimination laws—twice. (*See* D.E. 16 at 13–14.) First, he wrote to his supervisor that "the Laws of Equal Employment Opportunity (EEO) protecting an individual could be violated when . . . promotion standards/methods are used selectively to promote the interest of all employees in the branch while at the same time excluding another employee from the same standard of promotion." *Id.* at 682 (record citation omitted). Flowers never mentioned or even hinted at any anti-discrimination laws. Second, the plaintiff in *Emami* specifically "requested that an EEO representative participate in the Research Directorate" where he worked. *Id.* at 684. Flowers did not request the presence of an equal employment opportunity representative or official. Rather, this case is much closer to *Verna v. Public Health Trust of Miami-Dade County*, discussed in Electrolux's initial memorandum, in which the plaintiff's statement also "d[id] not reference any law or policy that the complained of behavior was violating" and thus was not protected activity.[3] 539 F. Supp. 2d 1340, 1358 (S.D. Fla. 2008); (*see* D.E. 13-1 at 13). Significantly, Flowers does not even attempt to distinguish *Verna* in his response brief.

---

[3] Consequently, because Flowers did not engage in protected activity before Electrolux placed him on a PIP, he cannot claim that the PIP was retaliatory. (*See* D.E. 13-1 at 15.)

### B. Electrolux treated Flowers and Robert Kean the same.

In support of his Title VII disparate treatment claim, Flowers argues that Electrolux artificially narrows the analysis by focusing solely on Robert Kean. (D.E. 16 at 19–21.) But the truth is that Kean is the only plausible comparator under this set of facts. (*See* D.E. 13-1 at 17–18 (explaining why this is so).) Flowers does not challenge this. Significantly, he fails to identify a single other coworker who qualifies as such. His nebulous references to other unnamed coworkers[4] do not satisfy this element of his prima facie burden. *See Coles v. Post Master Gen. USPS*, 711 F. App'x 890, 898 (11th Cir. 2017) ("To show disparate treatment based on a comparator, a plaintiff must *identify* an employee or employees 'similarly situated in all relevant respects.'" (emphasis added and citation omitted)); *see also, e.g.*, *Perez v. Brooks Cty.*, No. 2:19-CV-391, 2020 WL 4261253, at *5 (S.D. Tex. July 24, 2020) (dismissing disparate treatment claim where "Plaintiff d[id] not name a comparator or describe other circumstances to satisfy the fourth element").

Flowers also argues that Electrolux treated Robert Kean more favorably than him, and that this precludes summary judgment on this claim. Kean and Flowers both had performance problems. Both were placed on PIPs and both were fired. That is the reality. Flowers attempts to distract by taking a microscope to the minute differences between his situation and Kean's. (D.E. 16 at 20–21.) Flowers cites no authority to support his assertion that this level of scrutiny provides any evidence of discrimination. To the contrary, the Fourth Circuit has made clear that courts should "consider whether the comparator discipline evidence in the record, *taken as a whole*, is sufficient for [a plaintiff] to show that she was more severely disciplined than comparably situated employees outside her class who made [similar] errors." *Lauture v. St. Agnes Hosp.*, 429 F. App'x 300,

---

[4] While Flowers implies that all the other members of his team were white, this is incorrect. (*See* D.E. 16 at 19.) Flowers' coworkers were Caucasian and Indian. (*See* Simpson Dep. 23:22, 24:1, *available at* D.E. 13-4 at 6, 7.)

306, (4th Cir. 2011) (emphasis added). Electrolux did not discipline Flowers more severely than Kean. It placed both employees on a PIP and fired them when their performances failed to improve.

Faced with this evenhanded disciplinary treatment, Flowers cannot show that "he was treated in a manner which, but for his race, . . . he would have been treated differently." *O'Neal v. Moore*, No. CIV.06-2336(ADM/JSM), 2008 WL 5068947, at *20 (D. Minn. Aug. 22, 2008); *see, e.g.*, *Lee v. Lacy*, No. CIV.A. 7:07-CV-00488, 2008 WL 410127, at *3 (W.D. Va. Feb. 12, 2008).[5]

## V. Flowers' Disability Discrimination Claim

Despite his unsupported statements to the contrary, Flowers never put Electrolux on notice of his disability before sending the attorney demand letter, at which point Electrolux had already placed him on a PIP. (*See* D.E. 13-18.) While Flowers uses the term "medical leave" numerous times throughout his brief, this is a term of his own creation. Or at least, of his own definition. Electrolux uses the term "family and medical leave" to refer to the FMLA, which "provides eligible employees the opportunity to take unpaid, job-protected leave for certain specified reasons." (*See* D.E. 13-13 at 37–38.) Electrolux refers to ordinary "sick days" as such, or as "Paid Time Off" or "PTO," which is separate from vacation days. (*See id.* at 35–36.) These days may be used for, among other things, "[i]llness or medical care for self or family." (*Id.* at 36.)

Flowers admits that he never took FMLA leave while employed by Electrolux. (Flowers Dep. 33:16, *available at* D.E. 13-5 at 6.) He never took short- or long-term disability leave, either. (*See id.* 33:19; D.E. 13-1 at 3 n.2.) Instead, he merely took ordinary sick days when he needed to, and that "was never a problem." (Sinclair Dep. 68:21, *available at* D.E. 13-3 at 8.) But Flowers has attempted to relabel this as "medical leave" to further his argument that Electrolux somehow

---

[5] Flowers claims that Electrolux failed to address some of his Title VII case theories in its initial memorandum, but this is not so. (*See* D.E. 16 at 18–19.) His theories all allege disparate treatment in one form or another and are thus covered by Electrolux's analysis. (*See* D.E. 13-1 at 17–21.)

had notice of his disability before placing him on a PIP. This has been met with confusion by Electrolux employees. For example, Naomi Sinclair testified: "I guess when you say 'medical,' to me I think of -- I was aware he was sick, but I didn't know that it was a medical situation, medical leave." (Sinclair Dep. 160:15, *available at* D.E. 13-3 at 18.) And in July 2019, when Alexa Moor asked Flowers whether his request to be introduced to HR concerned "medical leave or . . . general HR questions/inquiries," Flowers did *not* state it was for medical leave. Instead, he merely said he wanted to discuss "a challenge [he was] currently facing." (D.E. 13-10 at 2.)

Flowers has not produced a single piece of evidence to support his self-serving testimony that he informed Electrolux of his disability before he was placed on a PIP—no witnesses, no emails, no documents. He never mentioned his diabetes, even when he reported that he was at the hospital or urgent care. And Electrolux, respecting his medical privacy, never asked. Merely stating he was at the hospital or urgent care is not enough to put Electrolux on notice of any disability. As Naomi Sinclair recounted, she once "went to urgent care for a bee sting." (Sinclair Dep. 160:25–161:1, *available at* D.E. 13-3 at 18–19.) Finally, even after sending the attorney demand letter, Flowers never told Electrolux that any of his subsequent absences had to do with his disability. Thus, the only protected activity he can point to is the attorney demand letter. As discussed above, this undercuts his temporal proximity argument and does not satisfy his burden.

**VI.     Conclusion**

Flowers needs evidence that would show that had he been white, or had he not had diabetes, or had his lawyer not written a letter, he would not have been fired. There is no such evidence. Flowers has thus failed to demonstrate that a genuine dispute of material fact exists. The Court should grant this motion and enter judgment in Electrolux's favor.

This the 4th day of August 2021.

    Respectfully submitted,

    /s/ *Mason G. Alexander*
    Mason G. Alexander (NC Bar No. 23945)
    Benjamin S. Morrell (NC Bar No. 56676)
    **FISHER & PHILLIPS LLP**
    227 West Trade Street, Suite 2020
    Charlotte, North Carolina 28202
    Telephone: (704) 334-4565
    Facsimile: (704) 334-9774
    Email: malexander@fisherphillips.com
    Email: bmorrell@fisherphillips.com

    *Attorneys for Defendant*

| | |
|---|---|
| JOBBIE FLOWERS,<br><br>      Plaintiff,<br><br>v.<br><br>ELECTROLUX NORTH AMERICA, INC.,<br><br>      Defendant. | Civil Action No. 3:20-CV-517-RJC-DCK |

**Certificate of Service**

I hereby certify that on the date listed below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notice to Plaintiff's counsel, L. Michelle Gessner, at michelle@mgessnerlaw.com.

This the 4th day of August 2021.

                                                          Respectfully submitted,

                                                          /s/ *Mason G. Alexander*
                                                          Mason G. Alexander
                                                          Attorney for Defendant
                                                          **FISHER & PHILLIPS LLP**