# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:20-cv-00517-RJC-DCK

JOBBIE FLOWERS,                )
                                     )
      Plaintiff,              )
                                     )
           v.                  )
                                     )       __ORDER__
ELECTROLUX NORTH AMERICA, INC.,    )
                                     )
      Defendant.           )
                                     )
_____)

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment. (DE 13). This matter has been fully briefed, and on January 25, 2022, the Court heard oral arguments from the parties. The Court has reviewed the pleadings, filings, exhibits thereto, and applicable law and has considered the parties' briefed and oral arguments. For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND

### A.  Procedural Background

Plaintiff Jobbie Flowers ("Flowers") filed a Complaint on September 19, 2020, against Defendant Electrolux North America, Inc. ("Electrolux") alleging (1) workplace discrimination and (2) retaliation based on race in violation of Title VII, (3) disability discrimination based on diabetes in violation of the Americans with Disabilities Act ("ADA"), and (4) wrongful discharge in violation of North Carolina law. (DE 1). After completing discovery, Electrolux filed the instant motion for summary judgment as to all Flowers' claims on June 30, 2021. (DE 13).

### B.  Factual Background

#### i.  Work History from 2011 to 2018

Flowers is an African American man with Type 2 diabetes. Electrolux hired Flowers in May 2011 to work in its information technology ("IT") department as an Application Support Analyst. In this role, Flowers provided internal IT support to other Electrolux employees. At Electrolux, the normal IT help desk process includes creating a help desk ticket when an employee calls in with an IT issue; assigning the ticket to a level one analyst to assist the employee; reassigning the ticket to a level two analyst if the level one analyst cannot fix the issue; and reassigning the ticket to a level three analyst if the level two analyst cannot fix the issue. Flowers was a level two analyst whose primary role was working the help desk and resolving issues. (DE 13-5 (Flowers Dep.) at 2–5, 24).

In 2015, Flowers was promoted to Application Support Team Lead where he oversaw two employees. In this non-management position, Flowers received a raise and additional responsibilities but resolving IT issues via the ticking process remained his number one priority. (DE 13-5 (Flowers Dep.) at 7–8, 17).

During 2017 and 2018, Flowers reported to Brenda Simpson, the Director of IT Operations.[1] Simpson is Caucasian. (DE 13-5 (Flowers Dep.) at 7; DE 13-4 (Simpson Dep.) at 2, 17). Flowers admits he had a "great relationship with Brenda Simpson." (DE 13-5 (Flowers Dep.) at 55). While Simpson was Flowers' direct manager, she "frequently observed problems with Flowers' work performance." (DE 13-8 (Simpson Dec.) at ¶3). In particular, Flowers "failed to keep [Simpson] informed of what he was working on," "failed to complete tasks within the assigned deadline," and "worked on tasks in a different order than [] instructed." *Id.* Simpson also noticed behavioral issues she described as "aggressive feedback" when she questioned Flowers about his work. (DE 13-4 (Simpson Dep.) at 5). The aggressive feedback "included him

---

[1] Flowers previously reported to Javier Balderrama and then to Mike Daniel. (DE 17-1 (Flowers Dep.) at 7).

expressing frustration when being questioned about his work, raising his voice, and speaking in a negative, sarcastic tone with fellow team members." (*Id.*; 13-8 (Simpson Dec.) at ¶3). Simpson also testified that Flowers' coworkers who were present at team meetings raised concerns in private to Simpson regarding Flowers' "behavior in speaking with the team . . . or being frustrated with being asked a question." (DE 13-4 (Simpson Dep.) at 7). Because of Flowers' work performance and behaviors, Simpson "frequently" had "coaching and one-on-one sessions" with Flowers. *Id.* at 13. These coaching sessions "would end in a positive way" and "the behavior would stop for a period of time" before "it would come back and [they] would have the conversation again." *Id.* at 8. Simpson described Flowers' behavior as "very inconsistent." *Id.* Simpson gave Flowers a "meets expectations" rating in his performance evaluations for 2017 and 2018. She picked this rating because it was the middle option out of five and Flowers "performance was inconsistent in that it would be good" and then "would require some coaching" which "leveled out to meets expectations." [2] *Id.* at 35–36.

ii. <u>Work History from 2019 to 2020</u>

In January 2019, Simpson hired Kopal Rawat, an Indian woman, to manage the team Flowers worked on. Rawat, who answered to Simpson, thus became Flowers' new direct manager. (DE 13-5 (Flowers Dep.) at 9). As Rawat was manager of Flowers' team, Flowers and Rawat regularly interacted. Flowers testified that "Rawat didn't like me for one reason or another, so she was always talking down to me. She was just very mean to me. She treated me differently than anyone else on the team." *Id.* at 10. Flowers also said Rawat was "very mean" to him, her behavior bordered on "belligerent," and that he felt "aggression" from her. (DE 17-1 (Flowers Dep.) at 22).

---

[2] In 2012, 2013, and 2014, Flowers received the highest rating of "exceptional" on his performance reviews. (DE 17-2, DE 17-3, DE 17-4). In 2016, Flowers received the second highest rating of "exceeds expectations." (DE 17-5). In 2017 and 2018, Flowers received the third highest rating of "meets expectations."

He further testified that he was held to different standards than other team members, like being required to do more weekly status reports than others on his team and that he was criticized by Rawat for not formatting status updates correctly. *Id.* at 39; (DE 17-19 (Flowers Dec.) at ¶15). Flowers believes that he was "singled out" and "there was nothing that [he] could do right . . . because I'm black." (DE 17-1 (Flowers Dep.) at 35).

When Rawat began managing Flowers, she observed many of the same work performance and behavior issues as Simpson. From conversations with Flowers, Rawat noticed that "Flowers' behavior from those discussions became unprofessional. He was angry, loud, rolled his eyes sometimes, [and made] sarcastic comments. It was just unprofessional behavior." (DE 13-2 (Rawat Dep.) at 9). Rawat found that Flowers had a propensity to interrupt team members and on at least one occasion Flowers walked out during the middle of a team meeting because he believed Rawat was "singling him out." *Id.* at 13–14. Regarding Flowers' work performance, Rawat found that Flowers failed in "keeping [her] updated with what he's been working on" which did not allow Rawat "to gauge his effort or where he was spending his time;" that Flowers was "delayed" in finishing tasks; and that Flowers followed "his own priorities" rather than those from upper management. *Id.* at 17. For one large project known as the SharePoint migration, Flowers delayed the project when he was "not sharing updates [and] not coming to the team meetings," and "the tasks he was working on took a really long time." *Id.* at 26; (DE 13-4 (Simpson Dep.) at 63).

On July 19, 2019, seven months after Rawat became Flowers' manager, Flowers asked Rawat to "introduce him to HR." (DE 13-2 (Rawat Dep.) at 8). Rawat immediately reached out via email to Alexa Moor, the HR business partner for IT, and copied Flowers to introduce them. *Id.*; (DE 13-10 (email chain)). Flowers informed Moor that he wanted "to discuss a challenge he was facing." (DE 13-9 (Moor Dec.) at ¶4). Moor is Caucasian. On the same day Rawat introduced

Flowers to HR, Rawat scheduled a meeting with her direct manager, Simpson, to discuss what had been happening with Flowers. (DE 17-11 (Rawat Dep.) at 17).

Before Moor met with Flowers, Moor met with Rawat individually in late July 2019. Moor said that Rawat complained to her that "Flowers was not keeping her informed as to what he was working on, not working on tasks in the order that he had been instructed to work on them, and not executing on deliverables." (DE 13-9 (Moor Dec.) at ¶5). Moor also noted that "this was not the first time [she] had been informed of performance issues concerning Mr. Flowers" as "Simpson had previously told [her] that she observed similar problems with Mr. Flowers' work performance when she was his direct manager." *Id.* at ¶6.

On July 24, 2019, after speaking with Rawat, Moor emailed Rawat a template of a performance improvement plan ("PIP") taken from one previously issued to another employee. *Id.* at ¶¶7–13. At Electrolux, the "PIP is intended to communicate Electrolux's clear expectations to the employee and set concrete deadlines for the employee to improve his or her performance." *Id.* at ¶¶8–9. Should the employee fail to follow the PIP, the employee could be terminated, "typically at the scheduled conclusion of the PIP." *Id.* However, it would not be considered "unusual" should "the manager [] end the PIP earlier than the scheduled date and terminate the employee's employment," if the employee failed to show improvement. *Id.*

Per Flowers' original request on July 19, Moor met with Flowers individually on July 26 to discuss his concerns. *Id.* at ¶14. During the meeting, Flowers told Moor that "he was frustrated with Ms. Rawat and that they were having problems communicating effectively." Moor then met with Flowers and Rawat together in early August 2019 to help them work through communication issues. *Id.* at ¶16. Flowers testified that he suggested more frequent one-on-one meetings with Rawat. (DE 17-1 (Flowers Dep.) at 24). At the conclusion of the meeting, Moor believed "the

situation had been resolved." (DE 17-11 (Rawat Dep.) at 16). At this time, Flowers had not been issued a PIP.

Following the meeting with HR, Flowers found that Rawat's behavior in these more frequent one-on-one meetings was "very combative." Flowers also stated that the meetings felt more like criticism than collaboration and "seemed like it was really just to collect documentation." (DE 17-1 (Flowers Dep.) at 26–28). On September 16, 2019, Flowers emailed Rawat, accusing her of treating their one-on-one meetings as "burdensome" and suggested discontinuing the meetings. Flowers also stated that he thought Rawat "reprimanded" him for having an opinion during a team meeting. Rawat responded by including her meeting notes describing Flowers' behaviors and actions he took during the meeting and said that Flowers was trying to "misquote what was discussed in our meeting." Flowers forwarded the email to his previous manager and Rawat's direct manager—Simpson. In the forwarded email, Flowers said "I think this level of communication requires a mediator." Simpson in turn forwarded the email chain to HR. (DE 13-12 (email chain)).

A few days later, Flowers sent a calendar invite to Rawat for a one-on-one meeting for September 23, 2019, with the following invite:

> I think we will require a mediator in all of our one-on-one's going forward. I think this will prevent any miscommunication that can sometimes lead to confusion on both ends. An Electrolux mediator or external party may [be] the best option but I would like to consult with HR to see what options are available. I was the Chairperson for the Diversity and Inclusion Network at Hewitt for two years. Also, as you know, I am a community activist in both Mecklenburg and Forsyth County so I have some experience handling these types of situations.

(DE 13-17 (calendar invite)). Simpson then met with Flowers to discuss his request for a mediator in all dealings with Rawat. Simpson explained that Electrolux was not staffed to have mediators present during every meeting with an employee and his manager. At the end of the meeting,

Simpson testified that Flowers "felt like [] he could progress forward and they would work better together and he would communicate, and so the request for mediator ended at that point.  It did not come back up."  (DE 13-4 (Simpson Dep.) at 3, 25).

At approximately this same time, Moor left Electrolux for another job and Naomi Sinclair assumed her role as the HR partner for IT.  Sinclair is African American.  (DE 13-9 (Moor Dec.) at ¶19; DE 13-3 (Sinclair Dep.) at 2, 9).

In October 2019, Roy Harris, the project manager for the SharePoint migration, shared concerns with Rawat regarding Flowers work performance on the project.  In particular, Harris told Rawat:

> [Flowers] had not been to the past two meetings and when I reached out to him, he stated that he was under the impression that his part of the work was completed (the IT SharePoint sites).  A few of those (IT sites) still need to be put into the correct state, but I assumed that once those were completed, then he would go back to the backlog and get more sites that need to be migrated.

(DE 13-7 (chat messages)).  Shortly thereafter Sinclair, the new HR partner for IT, met with Rawat and Simpson to discuss Flowers' work history and performance issues.  Simpson informed Sinclair that the issues Rawat was having with Flowers "were not new issues" and as Flowers' former direct manager, "she had experienced some of the [same] performance challenges in the past." (DE 13-3 (Sinclair Dep.) at 4; DE 13-8 (Simpson Dec.) at ¶4).  At the conclusion of the meeting, Rawat, Simpson, and Sinclair together decided to place Flowers on a PIP.  (DE 13-19 (PIP) at 4). The PIP was drafted from the template Rawat had previously received from HR.  The PIP provided specific goals for Flowers to meet and listed clear expectations.  On November 8, 2019, Rawat, Simpson, and Sinclair met with Flowers, informed him about the PIP, and explained how it worked.  (DE 13-2 (Rawat Dec.) at 30).  All four people in the meeting signed the PIP.  (DE 13-19 (PIP) at 4).  Flowers would later state the PIP was issued in direct contradiction of his proven

track record and that Rawat's behavioral description of Flowers as defensive, impatient, and aggressive "are all racial stereotypes of an 'angry Black man.'" (DE 17-19 (Flowers Dec.) at ¶10; DE 16 at 8).

On November 29, 2019, in response to the PIP, Flowers had his attorney send a demand letter to Electrolux. The demand letter stated that Flowers was treated "in a disparate manner than similarly situated employees" based on his race and diabetes disability as his supervisor "communicates with [him] in a hostile manner and scrutinizes Mr. Flowers performance at a greater rate than other employees." The letter also said that in late September 2019 Flowers went to the hospital for three days for a "diabetes flare up and informed [Electrolux] of the same." (DE 13-18 (Demand Letter)).[3] Flowers is unaware of any formal investigation conducted by Electrolux regarding potential race or disability discrimination against him.

In early December 2019, Rawat, Simpson, and Sinclair met with Flowers for a one-month PIP review. (DE 13-4 (Simpson Dep.) at 28). The one-month review document noted that Flowers "has not achieved the required improvement as outlined." (DE 13-19 (PIP) at 6). A few specific examples from the document include that Flowers failed to complete tasks on time despite multiple reminders; he only assigned himself one help desk ticket for the month even though he is required to assign himself tickets on a daily basis; he failed to respond to emails in a timely manner; he failed to send required weekly status reports to his manager; and he missed SharePoint migration deadlines. (DE 13-19 (PIP) at 6–7; DE 13-4 (Simpson Dep.) at 30). Flowers says that he actually completed his SharePoint responsibilities, that revised deadlines were incorrectly included in the PIP, and as team leader he only spent one-third the amount of time as others in his group on service

---

[3] Simpson was aware of the letter, but it is unclear on what date she became aware. (DE 17-8 (Sinclair Dep.) at 11–12). Rawat remembers a legal hold issuing relating to Flowers but does not remember the exact date she became aware of this. (DE 17-11 (Rawat Dep.) at 22–23). Sinclair was also aware of the letter, but it is unclear on what date she became aware. (DE 17-9 (Sinclair Dep.) at 3).

desk tickets. (DE 17-19 (Flowers Dec.) at ¶¶11, 18–19). Flowers believes he objectively met the PIP criteria. *Id.* at ¶¶4, 16–25.

Flowers two-month review was rescheduled from early January to January 22, 2020, to allow more time to evaluate Flowers' performance as the holidays intervened and Rawat and Flowers had missed some time for vacation or illness. (DE 13-3 (Sinclair Dep.) at 11; DE 13-2 (Rawat Dep.) at 29).

On January 10, 2020, Flowers and Rawat had a one-on-one meeting, which they regularly did after implementation of the PIP to discuss work performance. Sinclair from HR sat in on this meeting. Rawat recalls that Flowers "was not able to tell me how much time it took him to do [] work" and he had caught "up on emails for three or four days" that week. Rawat believed that "this is going nowhere" and that Flowers showed "no improvement." (DE 13-2 (Rawat Dep.) at 31; DE 13-3 (Sinclair Dep.) at 12). Sinclair, the African American HR manager who was also in the meeting, similarly recalls:

> [T]he reason why is it's rare that an employee, you know, is questioned by their manager, specifically in this case he was asked about what he had been working on, what projects, what he had been completing throughout that week, and his response stood out to me because, you know, he kind of had a smirk, and he stated that he had been checking some emails, and that he completed one assignment. And I wasn't really familiar with the length of time that it took to complete whatever that assignment was, so I remember asking, you know, Okay. Well, how long does it usually take to complete this assignment that he's stating he's worked on for the past three or four days? And the time period that [Rawat] responded with, it was not even a half a day worth of work. And so, you know, again, that stood out to me, that situation because I said, Okay. We have an employee that is on a performance improvement plan and is not able to at least try to muster up some, you know, reason as to why he hasn't been working for a few days while he's at work but not performing, it's quite unusual.

(DE 13-3 (Sinclair Dep.) at 16–17). Because of vacation, sick days, and his work schedule, Flowers stated in his declaration that it took him the "majority of the week of January 6, 2020

9

getting caught up on projects" which "requires a significant amount of email communication." (DE 17-19 (Flowers Dec.) at ¶24).

Immediately following the one-on-one meeting, Rawat and Sinclair agreed that the next step was termination. (*Id.* at 19). Together they went to Simpson with their recommendation of termination. (DE 13-4 (Simpson Dep.) at 34). The three—Simpson, Rawat, and Sinclair—agreed that termination was the proper next step. *Id.* at 33. Flowers was then fired at the rescheduled second-month PIP meeting on January 22, 2020, which cut short the 90-day PIP period by two weeks.[4] Sinclair explained that the PIP period was cut short "because there wasn't progress that was being made." (DE 13-3 (Sinclair Dep.) at 21). The two-month review PIP document stated the following work performance issues, among others:

- "[Flowers] worked on #3 priority user story rather than priority #1 and did not consult the manager before doing so. The failure to adhere to priorities assigned by manager has been addressed multiple times prior to and throughout the duration of the [PIP]."

- "[Flowers] has 10 tickets assigned since 12/05/2019. For reference, there are four team members on this team. The other team members worked on 26, 34, [and] 34 tickets each during this same period."

- Flowers closed help desk tickets before resolution.

- Flowers "was not able to provide any clear justification" on time spent working from 01/07/2020 – 01/10/2020 "and mentioned that he was catching up on emails for 4 days."

- "[Flowers] did not inform management of his absence on Tuesday, 12/17/19."

(DE 13-19 (PIP) at 9–10). Flowers' position was not replaced after his termination. (DE 13-4 (Simpson Dep.) at 26). In regard to his firing, Flowers testified that Rawat discriminated against him based on race:

---

[4] Flowers was on a PIP for 75 days before termination.

So because I'm Black now and that I have [Rawat] as a manager now, now I'm coming into question on whether or not I'm able to meet these expectations. But this was never an issue in the past. For the eight years that I worked at Electrolux before [Rawat] came on board, I never had a problem with any of these things. It happened after she came on board, and she discriminated against me because I'm Black. That's the bottom line. There's no other way that I can think of any reason why I wouldn't be able to meet any one of these expectations.

(DE 17-1 (Flowers Dep.) at 34).

Moor, the first HR partner assigned to Flowers, "never witnessed Jobbie Flowers state that he was being discriminated against on the basis of race or disability" and "never understood any of his complaints or other statements to mean that he was complaining about discrimination on the basis of race or disability." (DE 13-9 (Moor Dec.) at ¶15).

Sinclair, the second HR partner assigned to Flowers, never knew that Flowers had diabetes or that he believed there was racial discrimination until she learned of the attorney letter. (DE 13-3 (Sinclair Dep.) at 10).

Rawat also testified that Flowers never mentioned racial discrimination or talked about his diabetes. (DE 13-2 (Rawat Dep.) at 19, 23). Likewise, Simpson testified that Flowers never discussed racial discrimination with her or informed her of his diabetes. (DE 13-4 (Simpson Dep.) at 11, 27).

One other employee was terminated by Rawat via the PIP process. Robert Kean, a Caucasian man, was placed on a PIP on May 19, 2020 (after Flowers was terminated). Kean had previously been placed on a PIP once before and had successfully completed it. (DE 17-8 (Simpson Dep.) at 7). Kean was ultimately terminated for poor performance after failing to meet the performance goals in the second PIP.

   iii.   <u>Diabetes Disability</u>

Flowers was first diagnosed with Type 2 diabetes mellitus in 2015, four years after starting with Electrolux. (DE 13-5 (Flowers Dep.) at 24). During his employment, Flowers occasionally called in sick or took PTO and was in the hospital a couple times due to diabetes. (DE 13-3 (Sinclair Dep.) at 5–6). However, there is no evidence he ever missed more than three days of work in a row because of diabetes complications. (DE 13-5 (Flowers Dep.) at 6).[5]

Sinclair testified that Flowers never told her he had diabetes or any type of disability. The two other Electrolux employees who participated in the decision to terminate Flowers' employment—Simpson and Rawat—also testified that Flowers never told them he had diabetes.[6] Likewise, Moor—the original HR manager assigned to the IT department who worked with Flowers—"did not know that Jobbie Flowers had diabetes or any other disability" and "first learned that Flowers had a disability after the litigation of this case began, and after Flowers' employment with Electrolux had ended." (DE 13-9 (Moor Dec.) at ¶20).

Flowers testified that he was diagnosed with diabetes in 2015 at an Electrolux annual health fair where outside health care professionals were brought in, and that a coworker took him to the hospital from the fair. When Flowers came back to work from the hospital, he said he told everyone that he was just diagnosed with diabetes. (DE 17-1 (Flowers Dep.) at 46–47). Flowers further testified that he never sent an email that he was using sick leave for diabetes flare ups but said that Rawat and his team members knew he had diabetes because he told them all in a team meeting. *Id.* at 48. When questioned whether he ever asked for any sort of accommodation from Electrolux for his diabetes, Flowers said "I never asked them." *Id.* at 24. No testimonial evidence

---

[5] If Flowers had missed more than three days in a row, the HR department would need to be notified to file a short-term disability insurance claim. Such a claim was never filed on Flowers' behalf, nor did Flowers ever take FMLA. (DE 13-2 (Rawat Dep.) at 25; DE 13-5 (Flowers Dep.) at 6).
[6] Simpson does not remember Flowers ever informing her that he had diabetes and does not remember Flowers suffering from diabetes. (DE 13-4 (Simpson Dep.) at 27). Rawat also did not know Flowers was a diabetic and never heard Flowers discuss his diabetes at work. (DE 13-2 (Rawat Dep.) at 19).

12

from any coworker corroborates Flowers' claim that he told anyone at Electrolux about his diabetes.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for

13

the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III.   DISCUSSION

Plaintiffs can prove their claims for employment discrimination in one of two ways: by direct evidence, or, by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). It is left to plaintiffs' discretion as to which avenue they choose to proceed in proving their case. *Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Here, the claims involve the three-step *McDonnell Douglas* framework.

Under the three-step *McDonnell Douglas* framework, first, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Next, if the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the defendant to provide some legitimate, non-discriminatory reason for its employment decision. *Sanders*, 725 Fed. App'x at 229. Last, if the employer provides a non-discriminatory reason, the burden shifts back to the plaintiff to prove the reason is pretextual. *Id.*

### A.   Discrimination Claim under Title VII

Flowers alleges a disparate-treatment claim of race discrimination in violation of Title VII under a theory of employee disciplinary measures.

i.      Flowers' Prima Facie Discrimination Claim

"To establish a prima facie case of race discrimination under Title VII premised upon the enforcement of employee disciplinary measures, the plaintiff must show: (1) that she is a member of the class protected by Title VII, (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the

14

disciplinary measures enforced against her were more severe than those enforced against those other employees." *Hurst v. D.C.*, 681 F. App'x 186, 190 (4th Cir. 2017). Electrolux admits the first element—that Flowers is African American, and race is a protected class.

### a. Comparable Misconduct

"[T]o be a similarly situated comparator, the employee normally must share the same supervisor as [the] plaintiff." *Perry v. Mail Contractors of Am., Inc.*, No. 3:12-CV-405, 2013 WL 6119226, at *5 (W.D.N.C. Nov. 21, 2013). However, "the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Courts "therefore consider whether the comparator discipline evidence in the record, taken as a whole, is sufficient for [plaintiff] to show that she was more severely disciplined than comparably situated employees." *Lauture v. Saint Agnes Hosp.*, 429 F. App'x 300, 306 (4th Cir. 2011).

Here, Electrolux argues that Robert Kean is the only relevant comparator because he was the only other employee that Rawat managed with documented instances of poor work performance who was also placed on a PIP and fired. Kean is Caucasian. Kean was placed on a PIP before Rawat was hired, but successfully completed it. (DE 13-4 (Simpson Dep.) at 17–18). Kean's second PIP issued for poor work performance and began in May 2020, after Flowers was terminated. (DE 13-20 (Dean PIP) at 2). Kean continuously made mistakes while deploying code and caused detrimental problems on projects. (DE 13-2 (Rawat) at 5–6). This led to the second PIP. The second PIP was drafted from the same template as Flowers' PIP and included many of the same goals, expectations, and instructions. For example, both PIPs discussed completing tasks in a timely manner, documented instances of Kean and Flowers missing deadlines, and expected Kean and Flowers to keep management informed of their progress. (DE 13-19; DE 13-20).

Flowers argues that Electrolux unilaterally decided that there was only one comparator, that Flowers never discussed Kean in his deposition, and that Flowers' testimony shows he was treated differently than white coworkers. However, Flowers fails to provide an example of another comparator and none of these arguments address the issue of whether Flowers' misconduct was comparable to another coworker's misconduct who was not African American.

Flowers next argues that the Kean "defense was entirely contrived" and was "damage control [] to retroactively detract from the appalling disparate treatment of Flowers" because "Kean was terminated in June of 2020 after Flowers filed the instant lawsuit." (DE 16 at 20). This premise is incorrect as the Complaint was filed on September 19, 2020, after Kean was terminated. (DE 1). And, more notably, Flowers' allegation that Electrolux fired a white employee solely to protect itself in the instant litigation lacks any evidentiary support as Flowers provided no record cites. The only argument that Flowers made which addresses whether Kean is an appropriate comparator is that Kean's performance issues were far worse than Flowers.

In this regard, Flowers argues that Kean's performance issues were far more substantive in that he made continuous errors and that Flowers' performance issues were not substantive and instead related to Rawat's perception about how Flowers behaved towards her. Such an argument is unavailing as both Flowers and Kean had repeated substantive performance issues. For example, Flowers, like Kean, made continuous work-related errors (disregarding upper management priorities, failing to provide necessary updates, and repeatedly missing deadlines). They both were also both managed by Rawat, placed on PIPs, and ultimately terminated for failing to adhere to the PIPs. Flowers additional behavioral issues do not negate the comparable misconduct—repetitive poor work performance.

b.    *Severity of Disciplinary Measures*

16

Both Kean and Flowers experienced the same disciplinary measure—termination after being placed on a PIP. The only difference between the two is that Kean was put on a PIP for 60 days before termination and Flowers was put on a PIP for 90 days but was terminated two weeks before the 90-day period ended. Flowers argues this is more severe. However, the PIP for both Flowers and Kean clearly warned that if the employee failed to follow the PIP they could be terminated before the scheduled conclusion of the PIP. The fact that Kean did enough to keep his employment until the end of the 60-day PIP period and Flowers was terminated two weeks before the end of his 90-day PIP period does not negate the ultimate outcome of termination for both employees.

Moreover, to the extent the timing of the termination relates to severity, it tends to show that Kean was disciplined more severely. Kean was only given a 60-day PIP period unlike Flowers' 90-day period. This means that Kean had less time to reform his work performance issues and meet the PIP goals. And Flowers was ultimately given about 15 days longer than Kean to meet the PIP goals before termination (75 days versus 60 days). Accordingly, there is no evidence that a reasonable jury could find that the severity of the disciplinary measures was different as both employees were terminated after being placed on a PIP, and Flowers was given more time to correct his work performance issues than Kean. Moreover, "[Flowers'] own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination." *Mackey v. Shalala*, 360 F.3d 463, 469–70 (4th. Cir. 2004) (affirming summary judgment against plaintiff's discrimination claim). Flowers has thus failed to make a prima facie claim of race discrimination.

    ii.    <u>Legitimate, Non-Discriminatory Reason</u>

Under the second step of *McDonnell Douglas*, "if the plaintiff succeeds in proving a prima facie case [] the burden [will] shift to the employer, who must articulate a non-discriminatory reason for the difference in disciplinary enforcement." *Hurst v. D.C.*, 681 F. App'x 186, 190 (4th Cir. 2017). Electrolux argues that terminating Flowers for poor work performance was a legitimate, nonretaliatory reason. Flowers argues that there are genuine issues of fact whether Flowers was performing poorly prior to being placed on a PIP and there is evidence that Flowers was an exceptional employee before Rawat became his supervisor.

Flowers poor work performance as documented in emails, chats, and PIP documents as well as in testimonial accounts from four coworkers is a legitimate, nonretaliatory reason. Flowers' prior performance evaluations, which had decreased over the years, and his uncorroborated testimony that he was not performing poorly fail to negate this.

       iii.      <u>Pretext</u>

Under the third step of *McDonnell Douglas*, "[s]hould the employer articulate such a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the employer's reasons are not true, but instead serve as a pretext for discrimination." *Hurst v. D.C.*, 681 F. App'x 186, 190 (4th Cir. 2017). "[T]o establish that an employer's proffered reason for the challenged action is pretext for discrimination, the plaintiff must prove both that the reason was false, and that discrimination was the real reason for the challenged conduct." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

Flowers argues that the temporal proximity between the demand letter and termination, which was almost two months, establishes pretext.[7] Electrolux argues that Flowers cannot show

---

[7] The Court is aware that Flowers also argues there was a temporal proximity between Flowers informing Rawat he wanted to speak with HR and Rawat then reaching out to HR and her supervisor and then receiving a PIP template soon thereafter. However, as previously explained, there is insufficient evidence of racial animus to show pretext as the meetings with HR dealt with communication problems.

the decision to terminate Flowers for poor work performance was false and was in fact motivated by racial discrimination.

The Fourth Circuit has found that "a lapse of two months between the protected activity and the adverse action is sufficiently long so as to weaken significantly the inference of causation" and that any inference that may arise can be rebutted by "facts that, prior to the protected activity, [the employee] had been told that her performance was sub-par." *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005). However, courts in the Fourth Circuit have also found that three months can establish temporal proximity, depending on the facts of the case. *See, e.g.*, *Suggs v. 7-Eleven, Inc*., No. DKC 14-1903, 2015 U.S. Dist. LEXIS 80930, at *22 (D. Md. June 23, 2015). Importantly, the Court is unaware of any controlling case law that temporal proximity alone controls pretext.

As the Fourth Circuit found, a two-month temporal proximity is not sufficient when connected with other facts that the performance was sub-par. Here, as previously explained, there is ample evidence that Flowers' work performance was poor as Flowers was already on a PIP at the time the demand letter was sent. Moreover, it is undisputed that Flowers had been told his performance was sub-par. Flowers termination two weeks before the 90-day PIP period ended is not unusual considering Flowers was under review and failed to meet expectations. And his uncorroborated opinions alone cannot overcome summary judgment. *Mackey*, 360 F.3d at 469–70.

* * *

To the extent Plaintiff brings any other discrimination claims under Title VII, which is unclear based on the Complaint and the record, Flowers failed to provide corroborative evidence of his own self-serving opinions, which is insufficient to survive summary judgment on a

19

discrimination claim.  *Mackey*, 360 F.3d at 469–70.  Moreover, Flowers cannot show pretext, a necessary element for a discrimination claim, and as is evident here, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted).

**B.     Retaliation Claim under Title VII**

Flowers alleges that Electrolux retaliated against him in violation of Title VII for making complaints of race discrimination.  (DE 1 at 6–7).

i.     Flowers' Prima Facie Retaliation Claim

Under the first step of *McDonnell Douglas*, "the employee must first establish a prima facie case of retaliation. To do so, the employee must show that (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) the protected activity was causally connected to the adverse action."  *Rome v. Dev. Alternatives, Inc.*, 587 F. App'x 38, 40 (4th Cir. 2014) (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir.2011)).  "Electrolux admits that it took an adverse action against Flowers by terminating his employment after placing him on PIP."  (DE 13-1 at 11).

a.     *Protected Activity*

For a complaint to constitute "protected activity," it must "put the employer on notice that [it] was based on racial . . . discrimination."  *Shung-Lung Chao v. Int'l Bus. Machines Corp.*, No. 5:09-CV-77-BO, 2010 WL 2465234, at *4 (E.D.N.C. June 15, 2010), *aff'd sub nom.*, *Shun-Lung Chao v. Int'l Bus. Machines Corp.*, 424 F. App'x 259 (4th Cir. 2011).  Mere complaint of "unfair treatment" and even "harassment" do not suffice.  *Id.*

It is undisputed that the demand letter sent by Flowers' attorney on November 29, 2019, constitutes protected activity as it clearly put Electrolux on notice that Flowers was complaining of racial discrimination in violation of Title VII.  (DE 13-1 at 12; DE 13-18 (demand letter) at 2

("[I]t is evident EMA has treated Mr. Flowers in a disparate manner based on his race" which "violates Title VII.")). However, the parties dispute whether Flowers' previous complaints concerning Rawat and his letter requesting an outside mediator constitute protected activity.

Flowers generally argues that as "the only Black man on Rawat's team" his repeated complaints of Rawat's "hostility" constitute protected activity. (DE 16 at 14). However, complaints of "unfair treatment" and even "harassment" do not constitute protected activity. And Flowers' request to speak with HR regarding his relationship with Rawat never mentioned racial animus. Instead, it simply requested help "to discuss a challenge he was facing." (DE 13-9 (Moor Dec.) at ¶4). And there is no evidence that allegations of racial discrimination ever occurred in the meetings that Flowers had with HR or any coworkers.[8]

Flowers also argues that the September 23, 2019 calendar invite to Rawat for a one-on-one meeting, where he asks for a mediator in all future meetings, constitutes protected activity because of the "diversity and inclusion" language which a "reasonable reader" would understand meant "unlawful discrimination." (DE 16 at 14). As support, Flowers relies on *Emami v. Bolden*, 241 F. Supp. 3d 673, 683–84 (E.D. Va. 2017) which held that an email referencing anti-discrimination laws in general or an email with a request for an EEO representative to participate constitute protected activity because it would put a reasonable employer on notice of discrimination. *Id.* Such is not the case here.

The entirety of the September 23, 2019 message requesting a mediator is below:

---

[8] Rawat testified that Flowers "never, ever mentioned his race or him being African-American or him being black." (DE 13-2 (Rawat Dep.) at 23). Likewise, Simpson testified that Flowers never discussed racial discrimination with her. (DE 13-4 (Simpson Dep.) at 11, 27). Moor, the first HR partner assigned to Flowers, "never witnessed Jobbie Flowers state that he was being discriminated against on the basis of race" and "never understood any of his complaints or other statements to mean that he was complaining about discrimination on the basis of race." (DE 13-9 (Moor Dec.) at ¶15). Sinclair, the second HR partner assigned to Flowers, was "surprised" by the attorney letter because Flowers never mentioned race. (DE 13-3 (Sinclair Dep.) at 10).

I think we will require a mediator in all of our one-on-one's going forward. I think this will prevent any miscommunication that can sometimes lead to confusion on both ends. An Electrolux mediator or external party may [be] the best option but I would like to consult with HR to see what options are available. I was the Chairperson for the Diversity and Inclusion Network at Hewitt for two years. Also, as you know, I am a community activist in both Mecklenburg and Forsyth County so I have some experience handling these types of situations.

(DE 13-17 (calendar invite)). Nowhere does Flowers mention race, anti-discrimination laws, or request an EEO representative. Instead, he notes that his experience in a prior job and in the community has helped him learn that mediators can help prevent miscommunication issues, and Flowers testified that his role as an activist "centered around helping the homeless." (DE 13-2 (Flowers Dep.) at 11–12). Flowers' managers, Rawat and Simpson, testified that they did not recognize this request as a complaint of race discrimination. (DE 13-4 (Simpson Dep.) at 21–22; De 13-2 (Rawat Dep.) at 23).

Moreover, in *Verna v. Public Trust of Miami-Dade County*, the court held that even explicit mentions of race do not always constitute protected activity. 539 F. Supp. 2d 1340, 1357–58 (S.D. Fla. 2008) (A letter that includes the question "is it my color" does not trigger protected activity when, "read as a whole, the letter is not sufficient, as matter of law, to clearly put an employer on notice of a violation of the law.") (quotations and citations omitted). Here, there is no mention of race and even if "Diversity and Inclusion" is construed as alluding to race, there is nothing that would put a reasonable employer on notice of race discrimination. Accordingly, even taking the evidence in a light most favorable to Flowers, no reasonable jury could find that the mediator request constitutes a protected activity. And Flowers' uncorroborated statements about communications he had with coworkers cannot raise a potential dispute as "a plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination." *Mackey*, 360 F.3d at 469–70.

22

### b.    Causal Connection

To maintain a prima facie retaliation claim, the protected activity must be causally connected to the adverse action. *Rome*, 587 F. App'x at 40. The Fourth Circuit has ruled that "retaliation plaintiffs are limited to traditional principles of but-for causation and must be able to prove that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)) (quotations omitted). As the first protected activity was the demand letter, the only applicable adverse action is Flowers' termination as the PIP issued before the demand letter. Thus, there must be but-for causation between Flowers' termination and the demand letter.

The parties' predominate argument centers on whether the PIP is a relevant adverse action. As the Court previously found that the first protected activity was the demand letter—which occurred after the PIP issued—there can be no but for causation between the demand letter and the PIP. Thus, to meet the causal requirement, there must be evidence showing that but-for the demand letter Flowers' termination would not have occurred.

Flowers' only evidence of racial discrimination are his generalized uncorroborated statements[9] that contradict the testimony of four coworkers and documentary evidence. The testimony of the four coworkers is that they never knew, and Flowers never told them, of any alleged racial discrimination before the demand letter. This includes Rawat, Flowers' direct manager at the time he was terminated; Simpson, Flowers previous direct manager and Rawat's

---

[9] "I'm the person that was singled out. There was nothing that I could do right, and that's because I'm black." (DE 17-1 (Flowers Dep.) at 35). "Rawat characterized me in the PIP as defensive, impatient, and aggressive. These are all racial stereotypes of an 'angry Black man.'" (DE 17-19 (Flowers Dec.) at ¶10). "It happened after [Rawat] came on board, and she discriminated against me because I'm Black. That's the bottom line. There's no other way that I can think of any reason why I wouldn't be able to meet any one of these expectations." (DE 17-1 (Flowers Dep.) at 34).

direct manager at the time Flowers was terminated; Moor, the original HR employee who met with Rawat and Flowers; and Sinclair, the HR employee who took over for Moor and met with Rawat, Flowers, and Simpson. The documentary evidence including emails, text messages, and chat messages also fails to show that Flowers ever raised any discrimination concerns with any coworkers.

Unlike racial animus, there is ample documentary and testimonial evidence of Flowers' declining work performance and behavioral issues. The two most recent direct managers of Flowers both observed similar work performance issues which included failing to keep managers informed of work progress, failing to complete tasks in a timely manner, and failing to follow management's priorities. Both managers also noted that Flowers would get frustrated, raise his voice, and speak in sarcastic tones when questioned about his work. Flowers even walked out of a team meeting. The managers observations are confirmed by two different HR employees who were involved with Flowers. There are also email and PIP documents which list a number of specific work performance issues and goals that Flowers failed to meet. For example, during the period that Flowers was under a PIP, Flowers spent three to four days catching up on emails and could not account for what he worked on during an entire week. He also took significantly less service desk tickets than his fellow team members even though he admits this was his number one priority even as a team lead.

Moreover, the decision to terminate Flowers—which occurred a year after Rawat became his direct manager, six months after Flowers first reached out to HR about his communication issues with Rawat, and approximately 75 days after he was put on a PIP for work performance issues—was made by three Electrolux employees who all agreed that Flowers should be terminated for poor work performance. This group included Sinclair, an African American woman and HR

manager; Simpson, a Caucasian woman and former direct manager of Flowers; and Rawat, an Indian woman and direct manager of Flowers. Flowers produced no evidence that Simpson or Sinclair discriminated against him. And his uncorroborated testimony that Rawat discriminated against him "absent anything more, [is] insufficient to establish a prima facie case of discrimination." *Mackey*, 360 F.3d at 469–70. Flowers has thus failed to produce sufficient evidence to defeat summary judgment and cannot meet the causation requirement that but for the demand letter he would not have been terminated. Regardless, even if Flowers could show a prima facie retaliation claim, he cannot show pretext as required under *McDonnell Douglas* as explained below.

ii.      Legitimate, Non-retaliatory Reason

Under the second step of *McDonnell Douglas*, the defendant must "produce a legitimate, nonretaliatory reason" for the adverse employment action. *Billingsley v. Fed. Home Loan Mortg. Corp.*, No. 1:18-CV-755, 2019 WL 5104748, at *5 (E.D. Va. Oct. 10, 2019). As previously explained, poor work performance was a legitimate, non-retaliatory reason for Electrolux terminating Flowers.

iii.      Pretext

Under the third step of *McDonnell Douglas*, "the plaintiff resumes the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for discrimination." *Sharif v. United Airlines, Inc*., 841 F.3d 199, 203 (4th Cir. 2016). To show pretext, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (cleaned up). The myriad examples of Flowers' poor work performance, which have already been enumerated, show that the termination was not pretext for discrimination. Flowers has provided no evidence that would lead

a reasonably jury to find otherwise. And his "own self-serving opinions, absent anything more" are insufficient. *Mackey*, 360 F.3d at 469–70.

### C. Disability Claim under the ADA

Flowers alleges that Electrolux discriminated against him on the basis of his diabetes disability in violation of the ADA.

#### i. Flowers' Prima Facie Disability Claim

The ADA prohibits employers from discriminating based on the known physical or mental impairments of a "qualified individual with a disability." 42 U.S.C. § 12101 *et seq.* Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." *Id.* § 12112(b)(5)(A); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013). To state an ADA discrimination claim, a plaintiff must show that he (1) was a qualified individual with a disability; (2) was discharged; (3) was fulfilling the legitimate expectation of the employer; and (4) the circumstances of the discharge raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). Electrolux admits the first two elements—that Flowers had diabetes which is a disability covered by the ADA. (DE 13-1 at 22).

##### a. Legitimate Expectations

As previously discussed, Electrolux placed Flowers on a PIP and then terminated his employment for poor work performance. Electrolux argues that the ample testimonial and documentary evidence shows that Flowers was failing to meet Electrolux's legitimate expectations. Flowers argues that his prior promotion and raises when combined with his performance reviews and testimony raise a genuine dispute of facts.

The Fourth Circuit has found that similar facts which show an employee was first "reprimanded [] based on concrete, specific observations" and that the employer "accompanied its reprimands with explicit instructions on how to improve" show that the employee was not meeting the legitimate expectations of the employer. *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 517–18 (4th Cir. 2006). Moreover, when an employee is "placed on a PIP and given opportunity to meet her employer's performance expectations" but fails to do so because of "unprofessional behavior" and "poor performance," the employee "fail[s] to meet the legitimate expectations of her employer." *Bellounis v. Middle-E. Broad. Network, Inc*., No. 1:18-CV-00885, 2019 WL 5654307, at *4 (E.D. Va. Oct. 31, 2019). "A plaintiff's own testimony cannot demonstrate a genuine issue as to whether she was meeting expectations." *Id.*

Flowers' prior performance evaluations show a performance decline during his employment period with Electrolux that started before Rawat became his direct manager. And his promotion that occurred years earlier or general company wide raises do not, when "[f]aced with such abundant evidence [of poor performance], create a genuine dispute concerning his prima facie case." *Warch v. Ohio Cas. Ins. Co*., 435 F.3d 510, 518 (4th Cir. 2006). And "cherry-picking the record to find one isolated instance where [Flowers] arguably performed better than the average employee" cannot change this. *Id.* Thus, based on the evidence, no reasonable jury could find that Flowers was meeting Electrolux's legitimate performance expectations.

> b. *Reasonable Inference of Unlawful Discrimination*

"To establish the fourth prima facie element of a wrongful discharge claim under the ADA, [Flowers] must present some 'affirmative evidence that disability was a determining factor in the employer's decision.'" *Feldman v. L. Enf't Assocs. Corp*., 955 F. Supp. 2d 528, 539 (E.D.N.C. 2013), *aff'd*, 752 F.3d 339 (4th Cir. 2014) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc*.,

53 F.3d 55, 59 (4th Cir. 1995)). "[I]t follows that the employee must show that the employer knew of his alleged disability at the time it took the adverse employment action." *Id.*

Electrolux argues that the three individuals who made the decision to terminate Flowers did not know he was diabetic at the time he was terminated, and that even if the demand letter put them on notice, it was sent weeks after he was already placed on the PIP for poor work performance and there is no evidence that Flowers' disability was a determining factor in his termination. Flowers argues that Electrolux was aware of his disability before he was terminated and that the temporal proximity between the demand letter and his termination is sufficient to establish a prima facie case.

Flowers testified that he told his team members he had diabetes, that he passed along medical information to HR, and that his team members knew he was hospitalized and visited the ER because of his diabetes. This directly contradicts the testimony of four coworkers and is unsupported by the record evidence. Regardless, taking the facts in a light most favorable to Flowers, the demand letter was sufficient to put Electrolux on notice that Flowers' suffered from diabetes. However, there is no evidence which can raise a reasonable inference that Flowers was terminated after being placed on a PIP because he was diabetic.

Flowers' "two main symptoms" were "[f]requent urination" and seeing "spots if [his] blood sugar is high." (DE 13-5 (Flowers Dep.) at 22). Flowers also testified that flare ups could be debilitating for periods of time. *Id.* at 25. However, Flowers never missed more than three days of work at a time for sick leave, never took FMLA leave or short-term disability leave, and never ran out of sick days or was reprimanded for missing work. The only note regarding missing work in the PIP was for failing to inform his manager of an absence, not the absence itself. At the time, Flowers claimed the absence was for a "personal matter." (DE 13-21 (email)).

Moreover, the documentary evidence, including the PIP documents, and testimonial evidence from coworkers clearly delineates that Flowers was placed on a PIP and ultimately fired for work performance issues. There is nothing that mentions diabetes or even taking excess sick days as a work performance issue. And a two-month temporal proximity between the demand letter and termination does not establish a prima facie case in light of the record evidence. Thus, assuming Electrolux knew Flowers was diabetic, a reasonable jury could not find that diabetes was a determining factor in Electrolux's decision to terminate Flowers.

        ii.       <u>Legitimate, Non-Discriminatory Reason</u>

As previously explained, poor work performance was a legitimate, non-discriminatory reason for Electrolux terminating Flowers.

        iii.       <u>Pretext</u>

The myriad examples of Flowers' poor work performance, which have already been enumerated, show that the termination was not pretext for discrimination. Flowers has provided no evidence that could lead a reasonable jury to find otherwise. And his "own self-serving opinions, absent anything more" are insufficient. *Mackey*, 360 F.3d at 469–70.

**D.    State Law Claims[10]**

The Complaint includes claims for wrongful discharge in violation of public policy under the North Carolina Equal Employment Practices Act ("NCEEPA"). (DE 1 at 8). Flowers' retaliation claim under state law fails "because retaliation is not a basis for a wrongful discharge claim under state law." *See Adjabeng v. GlaxoSmithKline, LLC*, No. 1:12-CV-568, 2014 WL 10077476, at *9 n.7 (M.D.N.C. Jan. 23, 2014). Flowers' discrimination claims fail for the same reasons as his federal claims, as they are subject to the same analysis. *See Chamberlain v. Securian*

---

[10] In his response to summary judgment, Flowers does not address the state law issues raised by Electrolux.

*Fin. Grp., Inc.*, 180 F. Supp. 3d 381, 405 (W.D.N.C. 2016); *Bradley v. CMI Indus., Inc*., 17 F. Supp. 2d 491, 500 (W.D.N.C. 1998).

## IV.     CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment, (DE 13), is **GRANTED**.

**SO ORDERED.**

The Clerk is directed to close this case.

Signed: February 8, 2022

Robert J. Conrad, Jr.
United States District Judge